Kelvin SANDERS, Clark Brooks, and
Robin Robinson, Appellants,

v.

UNITED STATES, Appellee.

No. 94–CF–783, 94–CF–941, 94–
CF–1246, 00–CO–333.

District of Columbia Court of Appeals.

Argued Sept. 13, 2001.
Decided Oct. 31, 2002.

Michael L. Spekter, Washington, DC, appointed by the court, for appellant Kelvin Sanders.

William P. Barry with whom Mark J. Rochon, Washington, DC, was on the brief, for appellant Clark Brooks.

Kenneth Rosenau, Washington, DC, for appellant Robin Robinson.

Catherine A. Szilagyi, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher and Michael D. Brittin, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

After a jury trial, appellants Clark Brooks, Kelvin Sanders and Robin Robinson were convicted of multiple gun-related crimes, including armed robbery.[1] Appel-

---

1. Appellants and another individual were indicted for the alleged commission of twenty-four crimes, ranging variously as to each defendant from conspiracy to commit a robbery,

lants main contentions are that the trial court: (1) improperly admitted "other crimes evidence" through the introduction of a videotape made approximately three weeks prior to the commission of the charged crimes; (2) abused its discretion by allowing lay witnesses to offer opinion testimony concerning the identification of persons depicted in a store surveillance videotape and still photographs from the videotape; and (3) committed reversible sentencing errors. We generally affirm the judgment of the trial court as to the challenged aspects of the trial, but remand these cases to the trial court for resentencing, consistent with this opinion.

## FACTUAL SUMMARY

The government presented evidence showing that on the evening of September 27, 1993, Messrs. Sanders, Brooks, Robinson, and Donald Fletcher[2] robbed the KNT jewelry store, located at 7608 Georgia Avenue, in the Northwest quadrant of the District of Columbia, and its occupants. Mr. Robinson remained outside while the other men entered the store which was then occupied by the owner, Ms. Kim Thi Nguyen, her husband Mr. Chanh Ngo, and their daughter-in-law, Ms. Thuy Nguyen. One of the women opened the security door for the three men, believing they were customers. The events that subsequently took place were recorded by the store's video monitoring system.

Following the admission of the three men into the store, the men asked to see some of the jewelry, including wedding rings. As Ms. T. Nguyen revealed the price of a ring, Mr. Ngo entered the display area. Mr. Brooks pointed a gun at him and pushed him to the ground. He then knocked Mr. Ngo unconscious by striking him with the gun. Another man grabbed Ms. K. Nguyen and shoved her to Mr. Brooks, who struck her with the gun, also knocking her unconscious. Ms. T. Nguyen maneuvered to help her family, and Mr. Brooks kicked her.

Mr. Fletcher jumped behind the counter, broke the display cases and removed the jewelry.[3] As the men attempted to leave, Mr. Fletcher noticed Mr. Ngo crawling forward. Mr. Brooks shot him three times, and then hit the glass door with gunfire, allowing the men to flee.

When the men left the store, Ms. T. Nguyen called 911 to report the crime. She described the men generally as one "fat" male and two "skinny" males, and one of the men as weighing around 150–160 pounds. None of the store's occupants could identify any of the defendants, but Mr. Guy Greene, who had just gotten off of a Georgia Avenue bus at the time of the incident, testified that he identified the picture of Mr. Robinson as the man he saw driving away from the store in a tan Jeep.[4] In addition, a Montgomery County police

in violation of D.C.Code § 22–105(a) (1994) and armed robbery, in violation of §§ 22–2901, –3202, to carrying a pistol without a license, in violation of § 22–3204(a) and unlawful possession of a pistol by a convicted felon, in violation of § 22–3203(a)(2). For a complete list of crimes for which appellants were convicted, see note 16.

2. Mr. Fletcher pled guilty to armed robbery and conspiracy to commit robbery in exchange for testimony relating to the incident. He testified that two weeks prior to the rob-

bery, Mr. Sanders proposed that he join Messrs. Robinson and Sanders in order to make money. He met Mr. Brooks on the day of the robbery when the four men met to form a plan.

3. The government presented evidence valuing the jewelry at approximately $30,000.

4. At trial he was unable to indicate which photo he had identified as that of Mr. Robinson.

officer, who was on nearby surveillance duty at the time of the incident, stated that as he drove past the 7600 block of Georgia Avenue, he saw a tan Jeep outside the jewelry store. He identified Mr. Robinson's Jeep as the vehicle that he had seen.

The following week, all four men were arrested based upon evidence derived from the investigation of the store robbery. The police discovered Messrs. Sanders' and Brooks' palm prints at the store. Mr. Ngo identified a watch found at Mr. Brooks' girlfriend's apartment as one stolen from the store. Several lay witnesses identified the appellants from the store's surveillance videotape. In addition, Ms. Judy Gross testified that she saw the appellants divide up the stolen jewelry in her apartment.

In early October, Mr. Brooks encountered Mr. Fletcher in the dining room of the D.C. Jail. Mr. Brooks complained that Mr. Fletcher was talking about the incident and said that he should kill Mr. Fletcher; Mr. Fletcher felt that he had been threatened. In December 1993, Mr. Fletcher and Mr. Robinson were taken to the courthouse. Mr. Robinson approached Mr. Fletcher, and told him that he would pay Mr. Fletcher for not testifying against him.

## ANALYSIS

*The "Other Crimes" Issue*

We first set forth facts pertinent to the "other crimes" issue raised by Mr. Brooks. At trial, the government called Ms. Michi Whitfield, who had known Mr. Brooks "all [of her] life," and was his former fiancee, to establish that Mr. Brooks possessed a gun prior to the September 27 robbery. Her testimony focused on the period from June 1993 to mid-August 1993. During that time, she had an intimate relationship with Mr. Brooks, and saw him as well as his 9 millimeter Beretta gun "every day." He also showed her a picture of a Berretta in a book. She described the place where Mr. Brooks kept the gun in his house. When asked whether her relationship with Mr. Brooks ended "in part because he ... pulled a gun on you," she responded, "Yes." She went on to recount how Mr. Brooks had called her to his basement, and "pointed the gun to [her] head" as she sat on the sofa. Unknown to Ms. Whitfield at the time, a videotape camera recorded the event. She acknowledged that she had viewed the videotape later on the day of the incident. The government presented the portion of the August 1993 videotape, which showed Mr. Brooks holding a gun near Ms. Whitfield's head, and she confirmed that it accurately depicted the event. Initially, the court admitted only this portion of the videotape.

On cross-examination, Ms. Whitfield said that she had been engaged to Mr. Brooks but that he had taken the engagement ring back on the day of the incident with the gun in August 1993. She denied that Mr. Brooks had discovered she was seeing another man. In response to defense counsel questioning, she acknowledged that the "tape is much longer than the three or four minutes ... seen so far," and that she "kn[e]w what [was] on the rest of the tape." When defense counsel proceeded by asking her what happened after the gun-pointing episode, she testified that she and Mr. Brooks had sexual intercourse.

At the end of the cross-examination, the government argued that the cross-examination had undermined Ms. Whitfield's credibility, left the jury wondering about the remainder of the videotape, and thus, opened the door to evidence about the subsequent footage. The court agreed and the portion of the tape depicting Ms. Whitfield leaving Mr. Brooks' house naked was shown. After this portion of the tape was

played, Ms. Whitfield testified that she had intercourse with Mr. Brooks because she was afraid of him and that he forced her to walk home naked because he kept her clothes.[5]

Mr. Brooks argues that the videotape depicted prior uncharged bad acts and thus falls under the strictures of *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964). He challenges both the initial limited introduction of the videotape, as well as the subsequent ruling that defense counsel had opened the door to admission of the entire tape.

■■■ "A decision on the admissibility of evidence, of course, is committed to the sound discretion of the trial court, and we will not disturb its ruling absent an abuse of discretion." *Smith v. United States,* 665 A.2d 962, 967 (D.C.1995) (citations omitted). Nonetheless, we have long adhered to the principle that: "If evidence of prior bad acts that are criminal in nature and independent of the crime charged is offered to prove predisposition to commit the charged crime, it is inadmissible." *Johnson v. United States,* 683 A.2d 1087, 1092 (D.C.1996) (en banc) (citing *Drew,* 118 U.S.App. D.C. at 15–16, 331 F.2d at 89–90). But, *Drew* is not applicable where the challenged "evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Johnson, supra,* 683 A.2d at 1098.

Here, the government initially sought the admission of the videotape to demonstrate that Mr. Brooks "in the days, weeks, and months before the [Georgia Avenue jewelry store] robbery . . . pos-

sessed a nine millimeter pistol[,] . . . and armed himself with the gun on the day of the robbery and . . . used it in the course of the robbery." Mr. Brooks sought to exclude the evidence of the gun under *Drew,* and also argued that its admission would be substantially more prejudicial than probative. In *Busey v. United States,* the trial court admitted testimony that the defendant had possessed a weapon that may have been the murder weapon. 747 A.2d 1153 (D.C.2000). We declared that:

> The testimony that [the appellant] possessed a revolver that might have been the murder weapon was not admitted improperly to establish criminal propensity. That evidence was directly relevant, and was not *Drew* evidence, because it constituted evidence supporting the charge that [the appellant] was the person who [committed the charged crimes].

*Id.* at 1165; *see also Bright v. United States,* 698 A.2d 450, 455–56 (D.C.1997).

Similarly, the evidence of Mr. Brooks' possession of the nine millimeter gun supported the charge that Mr. Brooks used that same gun in the robbery of the jewelry store. Therefore, the videotape showing Mr. Brooks with the gun arguably was admissible as direct and substantial proof of the charged crimes. *See also, Johnson, supra,* 683 A.2d at 1097 (" 'An accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible.' " (quoting *Coleman v. United States,* 379 A.2d 710, 712 (D.C.1977))).

■■■ However, the analysis does not end here. "The one requirement that ap-

---

**5.** The court excluded testimony that Mr. Brooks burned Ms. Whitfield with a cigarette after they had intercourse.

plies to the admission of all evidence of 'other crimes,' *Drew* and non-*Drew* alike, is that relevance, or probative value, must be weighed against the danger of unfair prejudice." *Busey, supra,* 747 A.2d at 1165. "In weighing the probative value of evidence versus potential prejudice to the defendant, this court has adopted the standard ... in the other crimes context: 'evidence [otherwise relevant] may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice it poses.'" *Id.* (quoting *Johnson, supra*) [alterations in original]. "This balancing of probative value and prejudice is committed to the discretion of the trial judge, and this court will review it only for abuse of that discretion." Id. (citation omitted).

Here, the trial court arguably may have erred by determining that the probative value of the videotape was not substantially outweighed by its prejudicial effect when it initially allowed the videotape, showing Mr. Brooks pointing a gun at Ms. Whitfield, to be played during Ms. Whitfield's direct examination.[6] "[A]ppeals to the passions of the jury, such as the presentation of evidence of threats against a witness [has] the potential for great prejudice against the defendant." *Mercer v. United States,* 724 A.2d 1176, 1184 (D.C.1999) (citations omitted). Moreover, evidence of a violent and threatening act with a handgun may have a substantial impact on a jury. Where the government has presented other unimpeached oral testimony, as here, that the defendant possessed such a handgun, it may have been unnecessary for the jury to have been presented with such potentially inflammatory evidence during Ms. Whitfield's direct testimony.

We need not determine whether the trial court erred in permitting the jury to see the portion of the videotape showing the gun during the direct testimony of Ms. Whitfield, because, even assuming it did, Mr. Brooks was not sufficiently prejudiced by this error to justify reversal of his convictions. *See Hollingsworth v. United States,* 531 A.2d 973, 978 (D.C.1987) ("When the trial court's error is not so extreme as to require reversal by itself the reviewing court must weigh the severity of the error against the importance of the determination in the whole proceeding and the possibility for prejudice as a result.") (citation and quotations omitted). Several other witnesses testified that Mr. Brooks possessed a handgun. Of particular import, the trial court, *sua sponte,* provided extensive limiting instructions to the jury to mitigate the prejudicial impact of the evidence. The court cautioned the jury:

> Ladies and gentlemen, you have heard and seen evidence that the defendant, Mr. Clark Brooks, held a gun in his hand and that he put that gun to the head of Mi[ ]chi[ ] Whitfield. It is up to you to decide whether to accept that evidence. If you find that Mr. Brooks did hold that gun in his hand or that he did put it to the head of Ms. Whitfield, you may consider it only for the limited purpose of deciding whether Mr. Brooks

---

6. This court has noted:

> In deciding whether the danger of unfair prejudice and the like *substantially outweighs* the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Johnson, supra,* 683 A.2d at 1095 n. 8 (quoting JOHN STRONG, I McCORMICK ON EVIDENCE § 190 (4th ed.1992)) (emphasis in original).

possessed a gun. You may not consider this evidence for any other purpose.

Mr. Brooks has not been charged in this case with any offense related to holding the gun in his hand or putting it to the head' of Mi[ ]chi[ ] Whitfield and you may not consider this evidence to conclude that he has a bad character or that he has a criminal personality.

The law does not allow you to convict the defendant simply because you believe that he may have done bad things not specifically charged as crimes in this case. Mr. Brooks is on trial for the crimes charged and you may use the evidence of acts not charged only for the limited purpose of helping you decide whether he possessed a gun.

Furthermore, the government's closing argument was restrained with respect to the videotape showing the gun, referring to the videotape only with for the purpose of demonstrating Mr. Brooks' possession of the gun.

Added to the trial court's cautionary instruction and the government's restrained closing argument is the strength of the government's case. The incident at the Georgia Avenue jewelry store was videotaped, and a stolen watch was found in the apartment of Mr. Brooks' girlfriend. Also, the government presented accomplice testimony which was corroborated by eyewitness testimony, as well as testimony that revealed that Mr. Brooks' palm prints, as well as those of Mr. Sanders, were found on the glass jewelry cases at the store.

We now turn to the trial court's admission of other segments of the videotape. Subsequent to the introduction of the portion of the videotape showing Mr. Brooks pointing the nine millimeter gun, and during cross-examination, as we have seen,

Mr. Brooks' counsel questioned Ms. Whitfield's credibility by alluding to her sexual encounter with Mr. Brooks that afternoon, and also suggested that Ms. Whitfield was angry because Mr. Brooks broke off their engagement that day. The trial court admitted the videotape because "there's no question that the door was opened." [7]

 The government argues that the trial court properly admitted the remainder of the videotape under the narrow doctrine of curative admissibility. We agree. We have previously allowed for the introduction of inadmissible evidence in limited, circumstances: "Introduction of otherwise inadmissible evidence ... is permitted 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.'" *Mercer, supra,* 724 A.2d at 1192 (citations and other quotations omitted). Here, the trial court properly exercised its discretion in determining that the jury was wondering about "what else is on that tape," and in allowing a substantial part of the remainder of the videotape into evidence, because it corroborated Ms. Whitfield's testimony on direct examination, which had been impeached on cross-examination, and corrected the impression that the government was intentionally hiding the contents of the rest of the tape. Moreover, the court demonstrated restraint, following our directive that "[e]verything cannot come through the door," and excluding testimony that Mr. Brooks burned Ms. Whitfield. *Id.* (citations and quotations omitted).

Thus, while the trial court may have been premature in admitting the gun portion of the videotape during Ms. Whitfield's direct testimony, once she was impeached on cross-examination, the

---

**7.** The trial court excluded any reference to Mr. Brooks' alleged burning of Ms. Whitfield.

This alleged incident was not depicted on the videotape.

sanitized portion of the videotape was admitted properly to corroborate Ms. Whitfield's testimony regarding the gun, and to show that her intimacy with Mr. Brooks on the day the videotape was made, was coerced. Thus, for the reasons set forth above, Mr. Brooks would not have been prejudiced, even assuming initial error, because of the trial court's cautionary instruction, the strength of the government's case, and the subsequent admissibility of the videotape.[8] See Gaither v. United States, 759 A.2d 655, 662 (D.C.2000) ("trial court's instructions meaningfully reduced the risk of prejudice to [the appellant] so that even if it was error to admit [the witness'] testimony, the error was harmless").

*The Videotape Identification Issue*

■ Both Mr. Brooks and Mr. Sanders contend that the trial court abused its discretion by allowing the government to introduce lay, non-eyewitness videotape identification testimony. They maintain that such testimony "lacked a sufficient foundation," "was unreliable and suggestive," and that "the jury was just as able as the witnesses ... to view the videotape and determine" if Mr. Sanders (or Mr. Brooks) appeared on the tape. In claiming that the identification testimony lacked a sufficient foundation, Mr. Brooks contends that it was not "rationally based" on witnesses' perceptions, and that the government's proffer was inadequate.[9] The government argues that a proper foundation was laid for the lay witness identifications from the videotape or videotape photographs, and that because of the lack of clarity of the videotape it was helpful for the jury to hear the opinions of lay persons who were familiar with Mr. Brooks and Mr. Sanders.

We first set the factual context for the videotape identification issue. Prior to trial, the government proffered that lay witnesses who had "known one or more of the defendants for an extended period of time" and who were "well acquainted with the appearance and the voice of a given defendant," would testify. The government presented a number of witnesses who identified Mr. Brooks and Mr. Sanders from the jewelry store surveillance videotape that had recorded the incident on September 27, 1993, or by examining photographs from still frames of the videotape. The lay witnesses each testified that they knew the defendants personally and provided the nature and length of their relationship.[10]

8. Mr. Brooks' contention that evidence that he wore a bulletproof vest should have been excluded similarly fails for lack of prejudice.

9. In addition, he argues that the trial court should have conducted a hearing before admitting the testimony. He asserts that had the court done so before admitting the evidence, it could have considered what testimony would be helpful to the jury, as well as expert testimony concerning witness identifications from videotape images. Mr. Brooks also complains that the lack of a hearing hindered his ability to cross-examine the lay witnesses.

However, the record reveals that no one requested a hearing from the trial court. "As a general proposition, objections must be made with reasonable specificity; the trial judge must be fairly apprised as to the question on which he is being asked to rule." ... "Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal." *Newby v. United States*, 797 A.2d 1233, 1237 (D.C.2002) (citation omitted). Thus, Mr. Brooks cannot prevail on appeal unless he can show plain error, *i.e.*, that the trial court plainly erred in not holding a hearing *sua sponte*, and that this failure caused a serious miscarriage of justice— neither of which we think is present in this case.

10. The government's identification witnesses included: a man who grew up with Mr. Brooks as his neighbor for twenty-five years; a woman who went to junior high school with

The identification testimony was based upon the witnesses' "own observation" of the videotape and their knowledge of the appellants. The witnesses noted appellants' physical characteristics and other factors upon which they relied for identification. For example, Mr. Brooks' ex-girlfriend testified that she recognized Mr. Brooks from his "sway" and from his distinctive mustache. Messrs. Brown, Proctor and Rowley all recognized Mr. Brooks from his jacket and voice. Mr. Sanders' sister identified him as the person in the videotape who was wearing "[t]he blue sweat shirt and sweat pants with the white lines."

The trial court applied Federal Rule of Evidence ("F.R.E.") 701 in admitting the testimony.[11] It found that: "The videotape certainly in substantial part in this Court's view, is not all that clear" and that the individuals are all wearing hats and none of the photographs depicted the frontal portion of the individuals' faces. Based upon this finding, the court ruled that:

> [I]t would be particularly helpful in this case to have the testimony of individuals who are very familiar with the faces, the side angles, the body, the posture of the individuals who are depicted in the videotape and the still photos made from that videotape. [T]hus, the Court con-

cludes that the two tests set forth in 701 are satisfied.

We have held previously that: "Modern rules of evidence permit non-expert witnesses to express opinions as long as those opinions are based on the witness' own observation of events and are helpful to the jury." *Carter v. United States,* 614 A.2d 913, 919 (D.C.1992) (quoting *Fateh v. Rich,* 481 A.2d 464, 470 (D.C.1984)). We have never explicitly held, however, that a lay witness may identify a person from a videotape, or a photograph derived from a videotape.

The majority of jurisdictions that have decided cases involving lay witness testimony identifying a person depicted in a videotape, or in a still picture derived from the videotape, have affirmed the admission of such testimony under F.R.E. 701, or an identical state evidentiary rule, provided the witness has at least some degree of familiarity with the person identified.[12] For instance, in *United States v. Jackman,* 48 F.3d 1 (1st Cir.1995), the ex-wife of a defendant identified him after examining a photograph taken by a bank surveillance camera. The First Circuit held that: "[S]uch testimony is admissible, at least when the witness possesses sufficient relevant familiarity with the defendant that

Mr. Brooks for three years and had seen him in the past six months; Mr. Brooks' neighbor; Mr. Brooks' former boss; Mr. Brooks' ex-girlfriend; the president of a local youth club who had known Mr. Brooks for many years; Mr. Sanders' sister; and a man who had known Mr. Sanders for ten or fifteen years.

11. Federal Rule of Evidence 701 states: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R.Evid. 701, Pub.L. 93–595 (Jan. 2, 1975) (eff. Oct. 1, 1987).

12. *See e.g., United States v. Allen,* 787 F.2d 933, 936 (4th Cir.1986) (admitting witness identification testimony where witnesses were familiar with the defendant and photos depicted only parts of defendant's face); *United States v. Stormer,* 938 F.2d 759, 762 (7th Cir.1991) (finding identification testimony admissible where witnesses were acquainted with defendants for several years); *United States v. Wright,* 904 F.2d 403, 404–5 (8th Cir.1990) (admitting identification testimony where witnesses had known defendant for between two and thirteen years); *United States v. Langford,* 802 F.2d 1176, 1179 (9th Cir.1986) (admitting testimony where witnesses encountered defendant numerous times).

the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification." *Id.* at 4–5. (citations omitted).

A cousin and a parole officer provided lay testimony in *Langford, supra* at note 12, identifying the defendant as the person appearing in bank surveillance photographs taken during a robbery. The Ninth Circuit declared that:

> Such opinion testimony by lay witnesses is admissible under Fed.R.Evid. 701 if it is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of [the] testimony or the determination of a fact in issue." Such testimony is particularly valuable where, as in the present case, the lay witnesses are able to make the challenged identifications based on their familiarity with characteristics of the defendant not immediately observable by the jury at trial. We conclude that, because [the lay witness] had met with [the appellant] approximately 50 times and [another lay witness] had known [the appellant] most of his life, the opinions testified to by [the lay witnesses] were rationally based and helpful to the jury in determining a fact in issue.

802 F.2d at 1179 (citations omitted).

The Seventh Circuit affirmed the admission of lay testimony by two bank tellers who identified the defendant as the person in videotape surveillance photographs taken at the time of a bank robbery. *See Stormer, supra,* at note 12. Recognizing that the decision "to admit testimony under [F.R.E.] 701 is 'committed to the sound discretion of the [trial] court ...,'" *id.* at 761 (quoting *United States v. Towns,* 913 F.2d 434 (7th Cir.1990)), the court in *Stormer* applied the circuit's "general rule" that: "[A] lay witness may testify regarding the identity of a person depicted in a surveillance photograph 'if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.'" *Id.* at 761 (quoting *United States v. Farnsworth,* 729 F.2d 1158, 1160 (8th Cir.1984)). The lay witnesses in *Farnsworth* were two parole officers and a used car salesman who sold the defendant a car on the afternoon of the bank robbery. The court noted that:

> A witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if ... the witness is familiar with the defendant's appearance around the time the surveillance photograph was taken and the defendant's appearance has changed prior to trial.

*Farnsworth, supra,* 729 F.2d. at 1160 (citations omitted).[13] *See also United States v. Borrelli,* 621 F.2d 1092, 1095 (10th Cir.

---

**13.** Although *Farnsworth* included the "change in defendant's appearance" requirement, not every court applies such a requirement. For example, in the case of *United States v. Jackson,* 688 F.2d 1121 (7th Cir.1982), the court acknowledged that no evidence had been introduced to show that the defendant had changed his appearance, but allowed the lay witness identification testimony on the ground that it would be "helpful to a clear understanding of ... the determination of a fact in issue." *Id.* at 1126. *See also Robin-* *son v. People,* 927 P.2d 381, 384 (Colo.1996) (en banc) (court construed Colorado evidentiary rule identical to F.R.E. 701, and stated: "although [the defendant's] appearance did not change from the time the photograph was taken to the time of trial, lay opinion testimony by a witness familiar with [the defendant's] appearance would have been helpful to the jury in determining whether [the defendant] was indeed the robber in the photograph.") (citations omitted).

1980) (admitting identification testimony from stepfather where defendant had changed facial hair and hairstyle).

In another case, an employer and a probation officer identified the defendant as the person caught in a bank surveillance camera still photograph. *United States v. Pierce,* 136 F.3d 770 (11th Cir.1998). There, in a matter of first impression, the court cited cases from other circuits determining that "lay opinion testimony identifying a defendant in surveillance photographs is admissible under [F.R.E.] 701," *id.* at 774, and stated:

> Because we find that, ... "there is some basis for concluding that the witness[es][are] more likely to correctly identify the defendant from the photograph than is the jury," we hold that the district court acted within its discretion in admitting lay opinion identification testimony from [the lay witnesses] .... [B]ecause the surveillance photograph was admitted into evidence, the jury was certainly able to compare [the defendant's] appearance at trial with the appearance of the individual depicted in the photograph. In view of the disguise worn by the robber pictured in the photograph and the level of familiarity with [the defendant's] appearance both [lay witnesses] possessed ..., we conclude that the lay opinion identification testimony admitted was "helpful to the determination of a fact in issue" within the meaning of [F.R.E.] 701.

*Id.* at 775.

■■■■ In the case before us, we now hold that lay witness opinion testimony regarding the identity of a person in a surveillance photograph or a surveillance videotape is admissible into evidence, provided that such testimony is: (a) rationally based on the perception of a witness who is familiar with the defendant's appearance and has had substantial contact with the

defendant; and (b) helpful to the factfinder in the determination of a fact in issue. In permitting such testimony in cases such as the one before us, the trial court at least should be reasonably satisfied that because of the either obscured or altered appearance of the defendant in the photograph or the videotape, or changed appearance of the defendant, the lay witness is more likely to accurately identify the defendant than is the factfinder. We further hold that the admissibility of such testimony is subject to the sound discretion of the trial court.

■■■■ Applying these principles to the case before us, we conclude that the trial court did not abuse its discretion by admitting into evidence the opinions of lay witnesses who identified Mr. Brooks and Mr. Robinson as the two men appearing in the Georgia Avenue jewelry store's surveillance videotape and the photographs derived from the videotape. The government properly laid the foundation showing that each of the lay witnesses' opinion was rationally related to the witness' own perceptions, and that the testimony would be helpful to the jury. Like the trial court, we have no reason to question the reliability of the identifications. The lay witnesses demonstrated particular familiarity with both men and had had substantial contact with them.

The familiarity of the witnesses with the appellants was important in this case because: (1) the features of the men in the videotape and still photographs were obscured by their hats; (2) the videotape that was "not all that clear;" and (3) Mr. Sanders had removed his facial hair since the jewelry store incident. Indeed, the expert witness for Mr. Brooks testified that he was "not able to obtain a quality photograph [from the videotape] good enough to make a positive identification scientifically." Nonetheless, he credited

the usefulness of identification based upon personal recognition, such as that demonstrated by the lay witnesses in this case. Thus, the familiarity of the lay witnesses with the defendants, and their ability to identify them by physical characteristics and other factors undoubtedly was helpful to the jury. Consequently, we discern no reason to disturb the trial court's ruling admitting the identification testimony of the lay witnesses.

## The Batson Issue

■ Appellants also contend that their convictions should be reversed because the prosecutor exercised his peremptory challenges for racially-discriminatory reasons.[14] Specifically, they contend that the trial court erred by failing to scrutinize whether the reasons offered by the prosecution were pretextual.

During the jury selection process, each side was allowed twelve peremptory strikes and two additional challenges for alternate jurors.[15] The defense raised a *Batson* argument to the government's strikes which removed eleven black women and two black men. The trial court agreed that a prima facie case of discrimination had been established and ordered a hearing, requiring the prosecution to provide justifiable reasons for the strikes. The government articulated reasons that were not facially discriminatory. The court then considered the rational basis for the individual reasons, ruling that:

After having gone through this very extensive exercise, the Court ... paid very close attention to what the Government was profferring ... [and] does conclude ... that the Government has rebutted the prima facie case that was made, and that the jury ... was a constitutionally valid one.

Appellants now complain that the trial judge's scrutiny was insufficient. They primarily rely upon *Tursio v. United States,* 634 A.2d 1205, 1211 (D.C.1993), which requires the trial judge to consider the attorney's reasons and "prob[e] the prosecutor to determine why he had treated similarly situated black and white persons differently." *Id.* at 1212. Thus, they argue, the trial judge had the responsibility of questioning the government's responses, beyond its "inherent logic and credibility" regardless of whether the reasons were facially legitimate. *Id.*

■ However, appellants took no issue with the extent of the court's scrutiny at the hearing. Thus, we review this issue for plain error. *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Watts v. United States,* 362 A.2d 706, 708 (D.C.1976) (en banc) ("[U]nless the action now complained of constitutes plain error, the absence of timely objection effectively insulates the disputed [action] from appellate interference"). Even assuming that the trial court might have scrutinized the government's re-

---

14. The trial court must consider a three prong process once the composition of a jury has been challenged on race or gender-based grounds:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.

Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.

Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

15. The pool of eligible jurors (i.e., those not struck for cause), was estimated to be 82% black (25 females, 11 males) and 67% female. The defense used 6 of its 14 peremptory strikes on white males and 10 of its 14 strikes on males.

sponses more than it did, because appellants cannot establish that a "clear miscarriage of justice would otherwise result," their claims do not warrant reversal. *Harris v. United States*, 602 A.2d 154, 159 (D.C.1992) (en banc).

*The Severance Issue*

Messrs. Sanders and Robinson argue that the trial court erred by denying their motion to sever their trial from that of Mr. Brooks. Specifically, appellants Sanders and Robinson contend that they were prejudiced by the joinder of defendants, due to Mr. Brooks' outbursts in the presence of the jurors, and the inflammatory evidence admitted against Mr. Brooks, particularly the videotape and testimony of Ms. Whitfield and evidence that Mr. Brooks carried a gun and a bulletproof vest. Mr. Robinson also contends that he was entitled to a separate trial for the offenses of bribery and obstruction of justice.

■■■■ "Where individuals are charged jointly with committing crimes, there is a strong presumption that the offenses should be tried together." *Jackson v. United States*, 623 A.2d 571, 579 (D.C.1993) (citations omitted). Moreover, motions for severance due to prejudicial joinder are committed to the trial court's sound discretion. *See Ifelowo v. United States*, 778 A.2d 285 (D.C.2001); *Bright v. United States*, 698 A.2d 450, 454 (D.C.1997). And, "[m]isjoinder under Super. Ct. Civ. R. 8(b) is subject to a harmless error analysis." *Jackson, supra*, 623 A.2d at 581. (citations omitted).

■■■ Based upon our review of the record in this case, we detect no error, nor "manifest prejudice." *See Mercer v. United States*, 724 A.2d 1176, 1193 (D.C.1999) (internal citations omitted). With regard to the joinder of counts, the first twenty-one counts, see note 15, *infra*, pertained to a joint venture executed by all of the ap-

pellants at the same time with a common purpose. Evidence relating to these counts would have been mutually admissible in each trial of any co-conspirator. Although the last three counts each applied to only one individual defendant, the evidence regarding each was kept separate and distinct. The trial court emphasized the separate nature of the last three counts in instructing the jury, and in presenting its case, the prosecutor also stressed that evidence relating to each of the last three counts pertained to only one defendant. *See Thorne v. United States*, 582 A.2d 964, 965–66 (D.C.1990) (no showing of manifest injustice where "[t]he prosecutor presented the evidence of the two offenses separately and distinctly, and [the trial judge] properly instructed the jury that each should be considered separately").

■■■ Mr. Robinson's argument that he was prejudiced by the failure to sever count 24, charging him with bribery of a witness, from the other counts because of his desire to testify on that count but not the others, is unpersuasive. In moving for severance prior to trial, Mr. Robinson proffered that he would be "embarrassed" and "confounded" in his efforts to defend against the bribery charge and the other counts of the indictment, but he also indicated that he had "not decided whether he wishe[d] to testify concerning the armed robbery charges." We agree with the government that Mr. Robinson did not "make [ ] a convincing showing that he ha[d] both important testimony to give concerning one count and a strong need to refrain from testifying on the other." *Arnold v. United States*, 511 A.2d 399, 406 (1986).

As for appellants' argument relating to the trial court's refusal to sever their cases because of irreconcilable defenses and the damaging videotape that concerned only Mr. Brooks, the flaw in appellants' irrecon-

cilable defenses argument is that they all presented a misidentification defense, and no appellant implicated his co-defendants. Moreover, we have said previously that "[s]everance is not required merely ... because evidence against one defendant is more damaging than the evidence against the other." *(James A.) Johnson v. United States,* 596 A.2d 980, 987 (D.C.1991) (citations and internal quotation marks omitted). Here, the trial court carefully instructed the jury on the proper use of the videotape, saying that it had been shown "for the limited purpose of deciding whether Mr. Brooks possessed a gun." Furthermore, even assuming error regarding the joinder of the defendants, appellants have not established prejudice requiring reversal. *See United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986).[16]

*The Sentencing Issues*

Prior to trial, the government notified Messers Brooks, Robinson and Sanders that their felony convictions could be enhanced.[17] The government cited D.C.Code § 22–104a (1996), recodified at 22–1804a

16. Appellants also argue that there was insufficient evidence to convict them and that the trial court plainly erred by failing to interrupt the prosecutor's opening statement, *sua sponte.* These claims are unpersuasive given the record evidence, our standard of review, and our prior case law. *See e.g., Beatty v. United States,* 544 A.2d 699, 701 (D.C.1988) (on claims of insufficiency, we review the evidence in the light most favorable to the government); *Robinson v. United States,* 608 A.2d 115, 115–16 (D.C.1992) (regarding conspiracy); *Lattimore v. United States,* 684 A.2d 357, 359–60 (D.C.1996) (pertaining to armed robbery); *(Derrick) Johnson v. United States,* 544 A.2d 270, 276 (D.C.1988) (relating to the opening statement).

17. The convictions of the appellants, the D.C.Code provisions on which those convictions are based, and the unenhanced penalties for their crimes are as follows:
1. conspiracy to commit robbery (§ 22–105a (1996); § 22–1805a (2001))—fine not more than $10,000 or prison term of not more than 5 years, or both;
2. second degree burglary while armed (§ 22–1801(b) and –3202; § 22–801(b) and –4502)—— 2 to 15 years plus a period of imprisonment up to life;
3. possession of a firearm during a crime of violence ("PFCV") (second degree burglary) (§ 22–3204(b); § 22–4504(b))—— 5–15 years;
4. armed robbery (Chanh Ngo) (§ 22–2901 and –3202; § 22–2801 and –4502)—— 2 to 15 years plus a period of imprisonment up to life imprisonment;
5. armed robbery (Kim Nguyen)—— same code provisions and punishment as in no. 4;
6. armed robbery (Thuy Nguyen)—— same code provisions and punishment as in no. 4;

7. PFCV (armed robbery, counts 4–6)—— same code provisions and punishment as in no. 3.
8. assault with a dangerous weapon (ADW) (pistol) (Chanh Ngo) (§ 22–502; § 22–402)—— prison for not more than 10 years;
9. PFCV (count 8)—— same code provisions and punishment as in no. 3;
10. ADW (Chanh Ngo) (shod foot)—— same code provisions and punishment as in no. 8;
11. ADW (Kim Nguyen) (pistol)—— same code provisions and punishment as in no. 8;
12. PFCV (count 11)—— same code provisions and punishment as in no. 3;
13. ADW (Thuy Nguyen) (shod foot)—— same code provisions and punishment as in no. 8;
14. assault with intent to kill while armed (Chanh Ngo) (§ 22–501 and –3202; § 22–401 and –4502)—— 2 to 15 years plus imprisonment up to life in prison;
15. mayhem while armed (Chanh Ngo) (§ 22–506 and –3202; § 22–406 and –4502)—— not more than 10 years plus imprisonment up to life in prison;
16. PFCV (counts 14 and 15)—— same code provisions and punishment as in no. 3;
17. destroying property (glass) (Kim Nguyen) (§ 22–403; § 22–303)—— fine up to $1,000 or imprisonment for not more than 180 days, or both;
18. carrying a pistol without a license ("CPWOL") (§ 22–3204(a); § 22–4504(a))—— normally up to a $1,000 fine or imprisonment for not more than 1 year, or both, but § 22–3204(a)(2) carries a penalty of up to a $10,000 fine or imprisonment for not more than 10 years, or both, "[i]f [this] violation ... occurs after a person has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or another jurisdiction....";

(2001)[18] with regard to Mr. Brooks and Mr. Sanders; § 22–3204(a), recodified at § 22–4504[19] for all three men; and § 23–1328[20] for Mr. Brooks.[21]

### The § 23–111 Issue

Before the trial court may impose enhanced punishment, D.C.Code § 23–111 (2001) requires that certain procedures be followed.[22] We summarized the purpose and mandatory procedures of § 23–111, as

**18.** D.C.Code § 22–1804a (a)(1) provides:

> If a person is convicted in the District of Columbia of a felony, having previously been convicted of 2 prior felonies not committed on the same occasion, the court may, in lieu of any sentence authorized, impose a term of imprisonment of life without possibility of parole.

**19.** D.C.Code § 22–4504(a)(2) specifies:

> If the violation of this section occurs after a person has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or another jurisdiction, the person shall be fined not more than $10,000 or imprisoned for not more than 10 years, or both.

**20.** D.C.Code § 23–1328 provides:

> (a) Any person convicted of an offense committed while released pursuant to section 23–1321 shall be subject to the following penalties in addition to any other applicable penalties:

> > (1) A term of imprisonment of not less than one year and not more than five years if convicted of committing a felony while so released; and

> > (2) A term of imprisonment of not less than ninety days and not more than 180 days if convicted of committing a misdemeanor while so released.

> (b) The giving of a warning to the person when released of the penalties imposed by this section shall not be a prerequisite to the application of the section.

> (c) Any term of imprisonment imposed pursuant to this section, shall be consecutive to any other sentence of imprisonment.

**21.** In its January 1994, written notice to Mr. Brooks under D.C.Code § 22–1804a, the government cited two prior felony convictions: (1) a conviction in 1986 in the Circuit Court of Prince George's County, Maryland, for distribution of PCP— Case No. CT 86–774A; and (2) a conviction in 1992 in the Circuit Court of Prince George's County, Maryland, for distribution of cocaine— Case No. CT 90–2048A. The same convictions were cited in the government's January 1994, written notice to Mr. Brooks regarding D.C.Code § 22–4504. The government's January 1994, written notice to Mr. Brooks concerning D.C.Code § 23–1328 indicated that he committed the offenses charged in this case during his pretrial release. At a status hearing on January 26, 1994, counsel for Mr. Brooks acknowledged that he had received at least the notices pertaining to § 23–1328, and § 22–3204(a) (22–4504(a)). In response to the trial judge's question, counsel for Mr. Brooks stated that he did not "anticipate [filing] any [objections] on those [notices] that [he had] received." The written notices for Mr. Sanders and Mr. Robinson apparently are not included in the record on appeal, but Mr. Sanders does not deny that he received written notice, and Mr. Robinson does not raise the enhancement issue in his brief.

**22.** D.C.Code § 23–111(b) (1994) provides:

> If the prosecutor files information under this section, the court shall, after conviction

---

The footnotes continuing (19 through 24 descriptions in the narrower text):

19. unlawful possession of a pistol by a convicted felon (Mr. Brooks) (§ 22–3203(a)(2); § 22–4503(a)(2))— imprisonment for not more than 10 years;

20. unlawful possession of a pistol by a convicted felon (Mr. Robinson)— same code provisions and punishment as in no. 19;

21. unlawful possession of a pistol by a convicted felon (Mr. Sanders)— same code provisions and punishment as in no. 19;

22. threatening to injure a person (Don Fletcher) (Mr. Brooks) (§ 22–2307; § 22–1810)— fine not more than $5,000 or imprisonment of not more than 20 years, or both;

23. obstructing justice (Don Fletcher) (Mr. Brooks) (§ 22–722(a)(3); (same for 2001 code))— incarceration of not less than 3 years and not more than life, or fined not more than $10,000, or both;

24. bribing a witness (Don Fletcher) (Mr. Robinson) (§ 22–713(a)(1)); (same for 2001 code)— fined not more than $2,500 or imprisoned for not more than 5 years, or both. Both the 1996 and the 2001 code provisions are listed for the crimes. All counts except 19 through 24 pertain to all three men.

well as the implications of a failure to follow such procedures, in *Norman v. United States*, 623 A.2d 1165 (D.C.1993):

> D.C.Code § 23–111 sets forth the mandatory procedures by which the government may seek an enhanced sentence. *See, e.g., Coleman v. United States*, 295 A.2d 896 (D.C.1972). "Because enhanced sentencing involves imprisonment for extended periods of time, we have repeatedly mandated strict compliance with the procedures set forth in the code." *Boswell v. United States*, 511 A.2d 29, 31 (D.C.1986) .... In *Boswell*, the court explained that:
>
> > The statutory scheme ... requires the government to file before trial an information alleging previous convictions. D.C.Code § 23–111(a)(1). If the prosecutor has filed such an information, the trial court shall, after conviction but before pronouncing sentence, inquire whether the convicted person affirms or denies the allegations in the information. *Id.* § 23–111(b). The court shall also inform the person that any challenge to a previous conviction is waived unless made before sentence is imposed. *Id. If the person denies any allegation in the information, or challenges the validity of any of the cited convictions, he shall file and serve on the government a written response. Id.* § 23–111(c)(1).
>
> 511 A.2d at 31 (emphasis added) .... In order to comply with § 23–111, the trial judge "must afford the defendant the opportunity to affirm or deny any alleged past convictions and inform the defendant that the failure to challenge a past conviction prior to sentencing will

result in the waiver of any right to such a challenge in the future." *Logan v. United States*, 591 A.2d 850, 852 (D.C. 1991) (citation omitted). We have held that the "touchstone" of judicial compliance with § 23–111 is notice to the defendant; however, when such notice is given, technical violations constitute harmless error, and we will not remand for resentencing. *Id.* at 852.

*Id.* at 1168.

The § 23–111 procedures apply to sentences enhanced under § 22–1804a and § 22–4504. *See (Monroe L.) Coleman*, 628 A.2d 1005, 1008 (1993); *(Charles D.) Coleman, supra*, 295 A.2d at 898. However, they do not apply to a sentence enhanced under § 23–1328. *See Edwards v. United States*, 767 A.2d 241, 255 (D.C.2001).

 The government agrees that with respect to sentences enhanced pursuant to § 22–1804a and § 22–4504, the trial court erred by enhancing sentences for prior convictions without first engaging in the colloquy required by § 23–111(b). As the government states in its brief:

> [T]he trial court did not strictly comply with the requirements of § 23–111 when sentencing appellants, and this noncompliance constitutes error. *See Robinson v. United States*, 756 A.2d 448, 454 ([D.C.] 2000) ("We have repeatedly mandated strict compliance with the procedures set forth in § 23–111.") (internal quotation marks and alteration symbols omitted).

Nonetheless, the government asserts that the error "did not affect those counts for which appellants were sentenced within

---

but before pronouncement of sentence, inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and

shall inform him that any challenge to a previous conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

the normal range of penalties absent an enhancement."

The government's position is consistent with what we reiterated in *Brown v. United States*, 474 A.2d 161 (D.C.1984):

> In *Morris v. United States*, [436 A.2d 377,] 378 [D.C.1981] [per curiam], this court expressly concluded that "the procedures of § 23–111(b) are . . . mandatory . . . but only 'before enhanced penalties may be invoked.' . . . Where the substantive offense for which the defendant is convicted carries a potential life sentence . . . the court cannot impose any 'greater' sentence 'in lieu of' the sentence otherwise authorized, because there is nothing greater than a life sentence . . . ."

*Id.* at 163. In light of *Brown* and *Morris*, *supra*, upon remand, the trial court is not required to resentence Mr. Brooks with respect to any crime which carried a potential life sentence.[23] As for Mr. Sanders and Mr. Robinson, there was no error regarding counts for which they did not receive an enhanced sentence.[24] In short, we reject Mr. Brooks' assertion that he should be resentenced on *all* counts and Mr. Sanders' position that *all* of his sentences should be reversed due to the trial court's alleged error under D.C.Code § 23–111(b).

### The Double Enhancement Issue and the Enhancement of the Unlawful Possession of a Pistol by a Convicted Felon Conviction

Two other enhancement issues raised by Mr. Brooks should be addressed here. He contends that the trial court erroneously used his 1986 conviction for distribution of PCP in Prince George's County, Maryland to enhance his CPWOL sentence, both under D.C.Code § 22–4504(a) and § 22–1804a. Mr. Brooks correctly points out that we applied the principle of lenity in *Henson v. United States*, 399 A.2d 16 (D.C.1979), to preclude having "a prior felony serve double duty" with respect to § 22–4504(a) and § 22–1804a. *Id.* at 21. In its brief, the government concedes that: "It was not harmless error . . . for the court to sentence appellant Brooks to fifteen years to life for his CPW[O]L conviction. . . ." in this case, and the appropriate penalty for Mr. Brooks on count 18 should be "no more than 10 years." The government also notes, and we agree, that: "Appellant Brooks should also be resentenced on count nineteen to a sentence of no more than one year, because unlawful possession of a pistol by a convicted felon is a misdemeanor unless the offender has previously been convicted of a violation of D.C.Code § 22–3203 [§ 4502], and the government did not demonstrate that Mr. Brooks had such a prior conviction."

### The Merger Issues

We turn now to the merger issues.[25] All of the appellants contend that some of

---

**23.** In the case of Mr. Brooks, the government asserts that resentencing would not be required for his convictions of second degree burglary while armed (count 2), armed robbery (counts 4–6), assault with intent to kill while armed (count 14), mayhem while armed (count 15), and obstruction of justice (count 23).

**24.** According to the government's brief, these are counts 2–7, 9, 12, 14–17, and 21 in the case of Mr. Sanders; and every count except 18 with respect to Mr. Robinson.

**25.** We realize that the trial court has not yet addressed the merger issues involved in this case, undoubtedly because of this court's suggestion that those issues should await the outcome of an appellant's direct appeal. *See Warrick v. United States*, 528 A.2d 438, 443 n. 6 (D.C.1987). Nonetheless, in the interest of judicial economy, we offer guidance for the resolution of the merger issues raised by this case.

their convictions must be merged. Invoking the constitutional Double Jeopardy Clause and its prohibition against multiple punishment, Mr. Brooks argues that the multiple enhancements under § 22–104a [§ 22–1804a] "properly merge into one enhancement"; and alternatively, that the enhancements under these sections should be merged because of the rule of lenity since he "was sentenced to a maximum term of more than his natural life on each count." Mr. Sanders "asserts that the three individual robbery counts merge into one robbery," and that "the [ADW] [c]ounts likewise merge into the one robbery count and must therefore be dismissed." He also argues that the three PFCV counts merge into one. In addition, Mr. Sanders maintains that the armed robbery and ADW counts merge, and that he should have been sentenced on a single PFCV count.

The government agrees that the separate counts of ADW merge with the separate armed robbery convictions. *See Simms v. United States*, 634 A.2d 442, 447 (D.C.1993) (citing *Owens v. United States*, 497 A.2d 1086, 1096 (D.C.1985) ("when the assault is done in order to effectuate the robbery, it is not a separate offense")). The government acknowledges trial court error with regard to two of the five PFCV convictions, specifically those based on counts 9 (PFCV based on ADW against Chanh Ngo) and 12 (PFCV predicated on ADW against Kim Nguyen) because these PFCV convictions "are each predicated on an ADW conviction that merges with appellants' convictions for armed robbery." The government insists, however, that the three remaining PFCV convictions do not merge.

The government's position regarding the ADW-based convictions is consistent with *Morris, supra* (where the ADW conviction merges with an armed robbery conviction, the ADW conviction merges with the PFCV conviction relating to the same armed robbery conviction). Consequently the count 9 and count 12 PFCV convictions should be merged upon remand.

■ Whether the remaining PFCV convictions should be merged is a close question. As the government points out, we have held that multiple PFCV convictions based on separate independent crimes do not merge. *See Hanna v. United States*, 666 A.2d 845, 855 n. 12 (D.C. 1995) ("Each time the defendant commits an independent violent crime, a separate decision is made whether or not to possess the firearm during the crime."); *see also Stevenson v. United States*, 760 A.2d 1034, 1035 (D.C.2000). In this case, the three remaining PFCV convictions are based upon predicate offenses that do not merge under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) and *Byrd v. United States*, 598 A.2d 386, 390 (D.C.1991) (en banc): burglary while armed (supporting PFCV count 3), armed robbery (supporting PFCV count 7), and assault with intent to kill and mayhem (both supporting PFCV count 16). Second degree burglary while armed (count 2) and armed robbery (counts 4–6) do not merge because each offense requires proof of an element that the other does not. *See Hanna, supra*, 666 A.2d at 856. The assault with intent to kill and mayhem charges arising from the shooting of Mr. Ngo also do not merge because these crimes were committed after the robbery was completed and not to effect the robbery. *See Owens v. United States*, 497 A.2d 1086, 1096 (D.C.1985).

The fact that the underlying offenses do not merge does not end our inquiry, however. In *Nixon v. United States*, 730 A.2d 145 (D.C.1999), we applied the rule of lenity to two PFCV counts to avoid any serious constitutional question of double

jeopardy. We concluded that, under the circumstances of that case, the PFCV conviction based on the merged aggravated assault/mayhem counts against one victim merged with a PFCV conviction grounded on assault with intent to kill pertaining to four victims. *Id.* at 153. We said:

> [T]he District's legislature (the Council of the District of Columbia) has not clearly or unequivocally stated that a single possession of a single weapon during a single violent act may give rise to multiple PFCV prosecutions, and under the circumstances presented in this case, the rule of lenity should be applied.

*Id.* at 153.

In *Stevenson,* we clarified that *Nixon's* holding was limited to situations where a "single violent act" gives rise to multiple predicate offenses. *Stevenson, supra,* 760 A.2d at 1036. In *Nixon,* a single perpetrator committed multiple predicate offenses by a single act of firing shots into a car with four occupants. *See Nixon, supra,* 730 A.2d at 153. Because each offense arose from a single violent act, the rule of lenity dictated that the single act should support only one PFCV conviction. *See id.*

 The test for distinguishing single acts from multiple acts was whether the defendant had "reached a 'fork in the road,' leading to a 'fresh impulse' which resulted in a separate offense." *Stevenson, supra,* 760 A.2d at 1037 (quoting *Maddox v. United States,* 745 A.2d 284, 294 (D.C.2000)). The perpetrators in *Stevenson* committed armed burglary by entering a clothing store with an intent to rob the store. They then briefly talked to the store manager and another employee before brandishing a gun and completing the armed robbery. *See id.* at 1035. Although there was only a brief interval between the two crimes, the robbers "had an opportunity to reflect, or to reach a

fork in the road" before their decision to commit the robbery. *Id.* at 1037–38. As a result, the two crimes could support separate PFCV convictions.

As in *Stevenson,* in the case before us, appellants reached a "fork in the road" between their decisions to commit burglary while armed (count 3) and armed robbery (count 7). After they entered the jewelry store, the appellants asked to see some of the jewelry and were shown some rings. They did not begin the armed robbery until Mr. Ngo entered the display area. The decision to commit this separate crime of armed robbery supports separate PFCV convictions for the burglary charge and the armed robbery offense. Similarly, Mr. Brooks' decision to shoot Mr. Ngo as the men were leaving the store was a separate criminal act that supported a PFCV conviction (count 16) based on the underlying crimes of mayhem and assault with intent to kill.

In short, we conclude that the circumstances of the case before us are not controlled by *Nixon, supra,* and thus, application of the rule of lenity is inappropriate. On remand, the trial court should not merge counts 3, 7, and 16.

 Appellants further assert that the crimes of unlawful possession of a pistol merge with carrying a pistol without a license. The *Blockburger/Byrd* legal principle also applies to these convictions: "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Byrd, supra,* 598 A.2d at 389. Under this principle, convictions for these crimes do not merge. *See Palmore v. United States,* 290 A.2d 573, 584–85 (D.C.1972).

■ Furthermore, appellants contend that their three convictions for armed robbery should have merged because the robbery was committed against one entity— the store. Their argument fails under *Davis v. United States*, 498 A.2d 242, 246 (D.C.1985). There, this court remarked, "robbery under D.C.Code § 22–2901 is basically a crime against the person." *Id.* (citation omitted). In light of this fact, more than one armed robbery occurs where "[e]vidence shows that each [person] was the victim of a robbery because separate acts of violence were required to prevent each of them from retaining control of the property for which they were responsible." *Id.* (citation omitted).[26] Thus, appellants armed robbery convictions do not merge.

### The D.C.Code § 23–1328 Issue

Mr. Brooks challenges the enhancement of his sentences under § 23–1328.[27] He argues that either the doctrine of merger or the rule of lenity precluded the trial court's "impos[ition of] 2[1] different, consecutive sentences of 20–60 months because [he] was on pretrial release at the time of the jewelry store robbery." He claims that he is being subjected to "multiple punishments for the same conduct" in violation of the constitutional Double Jeopardy Clause. In the alternative, he "submits that the rule of lenity weighs in favor of the merger of the § 23–1328 enhancement with the § 22–[1804a] enhancement rather than the imposition of 2[1] maximum sentences of 'life plus 60 months.'" The government asserts that Mr. Brooks

did not receive multiple punishments for the same offenses.

D.C.Code § 23–1328 was enacted to deter those on pretrial release from future criminal conduct. *See Speight v. United States*, 569 A.2d 124, 127 ( D.C.1989) (en banc) (citing 116 CONG. REC. 8210–11 (1970)). Section 23–1328 provides, in pertinent part, that:

(a) Any person convicted of an offense committed while [on pretrial] release[ ] ... shall be subject to the following penalties in addition to any other applicable penalties:

(1) A *term of imprisonment of not less than one year and not more than five years* if convicted of committing a felony while so released[.]

As we said in *Speight, supra:* "Section [23–]1328, providing increased penalties for offenses committed while on release, was ... intended ... to deter crime perpetrated by individuals on release" *Id.* at 127 (footnote omitted). We have emphasized that additional penalties under § 23–1328 are imposed due to the commission of a second offense while on pretrial release status:

Under section [23–]1328, penalties flow, not from the "mere fact of arrest," but from the affirmative act of engaging in an offense, resulting in conviction, during post-arrest release.

*Id.* at 130.

Here, Mr. Brooks committed, not just "an offense," or "a felony,"while on pretrial release, *see* § 23–1328(a)(1); he committed multiple felony offenses. We have not

---

**26.** Appellants also argue that a person cannot be convicted of both threatening to injure a person and obstruction of justice. They urge us to overrule *Ball v. United States*, 429 A.2d 1353, 1360 (D.C.1981) because the punishment for obstruction of justice has since increased dramatically. However, appellants' claim fails because this division is bound to

the *Ball* decision. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

**27.** At the time he committed the offenses involved in this case, Mr. Brooks was on pretrial release status in Criminal No. M–9559–93, Superior Court of the District of Columbia.

previously considered whether, in the case of multiple offenses committed during pre-trial release, § 23–1328 permits only one enhancement of all these offenses. *Speight, supra,* involved only one felony offense committed while on pretrial re-lease, distribution of cocaine. *Id.* at 125. In *Daniel v. United States,* 408 A.2d 1231 (D.C.1979), the trial court apparently im-posed a single one-to-five year enhance-ment penalty where the appellant commit-ted two felony offenses while on pre-trial release, *id.* at 1232, but the issue regard-ing a § 23–1328 enhancement of each of his felonies committed during his pretrial release was not presented to the court.

 "It is well-settled that sentencing judges are afforded broad discretion," *Speight, supra,* 569 A.2d at 129 (footnote omitted). Such discretion of course is limit-ed by the Constitution of the United States. We have determined that § 23–1328 does not violate "constitutional equal protection." *Daniel, supra,* 408 A.2d at 1233. Similarly, here, we detect no consti-tutional violation under the Double Jeopar-dy Clause.

 In a sentencing context, "the Fifth Amendment Double Jeopardy Clause safeguards a defendant from . . . multiple punishments for the same offense." *Unit-ed States v. Allen,* 755 A.2d 402, 406 (D.C. 2000) (citation omitted); *see also Maddox v. United States,* 745 A.2d 284, 294 (D.C. 2000). The Double Jeopardy Clause does not, however, " 'prohibit separate and cu-mulative punishment for separate criminal acts.' " *Maddox, supra,* 745 A.2d at 294 (quoting *Owens v. United States,* 497 A.2d 1086, 1094–95 (D.C.1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986)). Here, after proper merger in ac-cordance with *Blockburger* and *Byrd, su-pra,* Mr. Brooks will not be sentenced for "the same offense" with respect to en-hancement penalties under § 23–1328. He committed several distinct and separate offenses while on pretrial release. Given the plain words of § 23–1328(a)(1), stated in the singular— "an offense" and "a felo-ny" as opposed to "offenses" and "felo-nies," the legal principles articulated in *Blockburger* and *Byrd, supra,* and absent any statement of legislative intention to the contrary, the imposition of a § 23–1328 enhancement for each of Mr. Brooks' sepa-rate, non-merged offenses does not violate the Double Jeopardy Clause.

We are also unpersuaded by Mr. Brooks' alternative argument that the rule of lenity should be applied to merge the § 23–1328 enhancement with the § 22–1804a enhancement, and to impose only one enhancement under § 23–1328, partic-ularly since Mr. Brooks "was sentenced to a maximum term of more than his natural life on each count." The circumstances prompting our application of the rule of lenity in *Nixon, supra,* are not present here. There, we applied the rule of lenity "to avoid constitutional doubt" under the Double Jeopardy Clause. *Id.* at 153. We do not have a similar constitutional doubt in this case. In our earlier consideration of the merger issues raised here, we dis-tinguished the facts facing us in *Nixon* from those in this case. We explained that, here, unlike in *Nixon,* appellants "reached a 'fork in the road' between their decisions to commit burglary while armed (count 3) and armed robbery (count 7) [, and between those decisions and] . . . the decision to shoot Mr. Ngo as the [appel-lants] were leaving the store. . . ." Thus, the charges relating to the burglary, the robbery, and the shooting, must be regard-ed generally as separate offenses, not the same offense. In short, there is no consti-tutional doubt here because Mr. Brooks is not being subjected to multiple punish-ment for the same offense, in violation of the Double Jeopardy Clause.

We also applied the rule of lenity in *Nixon, supra,* because of doubt pertaining to legislative intent in a situation like that presented by *Nixon. Id.* at 153. Here, the legislative history concerning the enactment of § 23–1328 is quite clear. Congress intended to deter those on pretrial release from committing additional crimes.[28] *See Speight, supra.* Therefore, in light of this legislative history, and the reference to "an offense" and "a felony" in § 23–1328, we do not have the same doubt about the legislature's intent regarding the enforcement of our criminal code in this case as prompted our application of the rule of lenity in *Nixon.* To reiterate, the Double Jeopardy Clause does not "prohibit separate and cumulative punishment for separate criminal acts." *Maddox, supra,* 745 A.2d at 294 (citations and internal quotations omitted).

Accordingly, for the foregoing reasons, we affirm the judgments of convictions for Messrs. Brooks, Sanders and Robinson. However, we remand all cases to the trial court for resentencing consistent with this opinion.

*So ordered.*

---

**28.** We detect no legislative intent to support Mr. Brooks' argument that the § 23–1328 enhancement should be merged with the § 22–1804a enhancement.