The WASHINGTON POST COMPANY,
Petitioner,

v.

DISTRICT UNEMPLOYMENT COMPENSATION BOARD, Respondent.

No. 10870.

District of Columbia Court of Appeals.

Submitted Jan. 4, 1977.

Decided Sept. 2, 1977.

Richard Hotvedt and Michael A. Caldwell, of Seyforth, Shaw, Fairweather & Geraldson, for petitioner.

Bill L. Smith, Russell L. Carter, Robert J. Hallock, Washington, D. C., and Earl S. Vass, Jr., Richmond, Va., for respondent.

Before KELLY, KERN and YEAGLEY, Associate Judges.

KERN, Associate Judge:

Thirty-six pressmen formerly employed by the Washington Post newspaper (Post) in its pressroom sought and were denied unemployment compensation by Claims Deputies of the District Unemployment Compensation Board (Board). Twenty-eight of the claimants appealed to the Board's Appeals Examiner who heard ex-

tensive testimony from four witnesses, including the President of the International Printing and Graphic Communications Union Local 6 (Union), to whom the pressmen belonged, and three officials of the Post management. The Appeals Examiner made comprehensive findings of fact and conclusions of law and determined that the claimants were not entitled to benefits under the District of Columbia Unemployment Compensation Act (Act) because their unemployment during the weeks for which they had made claims was "a direct result of a labor dispute still in active progress in the establishment where . . . [they were] last employed". *See* D.C.Code 1973, § 46–310(f), set forth in pertinent part in footnote 5 herein.[1]

The Appeals Examiner described in his findings the factual background of the dispute. In essence, the Post and the Union have a written agreement pursuant to which the Post informs the Union at regular intervals how many pressmen it needs (the "markup") and the Union then provides the requisite number of pressmen on the basis of their seniority. Those pressmen with sufficient seniority enabling them *always* to be reached by the markup are known as "situation holders" and have the right to receive *overtime* pay whenever they work for other situation holders who "scratch," *viz.*, absent themselves from work with advance notice.

Whenever situation holders scratch, the Union, pursuant to its agreement with the Post, has discretion in selecting replacements either from situation holders, who must be paid overtime, or substitutes, who are without sufficient seniority to be paid overtime and hence may be paid straight time.[2] The way the Union exercised its discretion in this replacement procedure became the crux of a dispute. In negotiations with the Union over the course of this dis-

1. The Appeals Examiner defined a labor dispute as:

   . . . any controversy concerning wages, hours, working conditions, or terms of employment, arising out of the respective interests of an employer and employee, or a dispute over such matters arising between the parties regardless of whether they stand in the proximate relation of employer and employee.

2. The practice of replacing one situation holder with another situation holder at *mandatory* overtime pay is referred to as "sticking."

**438**

pute, the Post argued that the absence of situation holders was too frequent and their replacement by other situation holders at time and a half pay (as distinguished from substitutes at straight time) too extensive; the Union responded that its replacement policy was wholly consistent with the terms of the basic contractual agreement it had with the Post.[3]

The Post on December 9, 1974, informed the Union that it was reducing the number of pressmen in its markup effective December 29, 1974, which had the practical effect of reducing the number of situation holders, *viz.*, those pressmen who would be assured of work and hence enabled to select their days off and to ensure themselves of overtime pay if they were called to replace other situation holders who chose for any reason not to work. The reduction of the number of pressmen in the markup consequently reduced the Post's operating costs because fewer situation holders would be able to claim overtime when they substituted for other situation holders who scratched. In two meetings between the Post and Union representatives on December 13 and 14, 1974, the positions of both sides were clearly drawn. The Post offered the Union a compromise whereby the 36 pressmen displaced by the reduction in the markup would form a "pool" as substitutes for situation holders who scratched, and thus there would be no decrease in the overall employment of pressmen. The Union flatly rejected this offer because it would result in the elimination of overtime for the 36 pressmen deleted from the mark-

up and they would not be able themselves to select time off.[4] The Union voted to reject the offer and on December 29, the 36 pressmen ceased reporting for work and shortly thereafter filed claims for unemployment compensation which are the subject of this proceeding.

The issue at the hearing before the Appeals Examiner presented for determination was whether the Post's action in reducing its markup was a layoff of employees necessitated by the paper's reduced earnings and increased costs or the direct result of a labor dispute over wages, hours and terms of employment as reflected in the paper's decision to reduce the markup to avoid "sticking" by the Union. The Appeals Examiner concluded the Post's reduction of the markup was an effort to avoid the payment of overtime by decreasing the number of situation holders and hence the pressmen were unemployed because of a labor dispute over terms of employment rather than due to the Post's economic distress. Accordingly, he disqualified the claimants from unemployment compensation. D.C.Code 1973, § 46–310(f).[5]

The pressmen appealed the Examiner's decision to the Board which after receiving briefs and hearing argument, issued a decision reversing the Examiner. It concluded that the claimants were unemployed because of a layoff rather than a labor dispute. The Board found:

[t]he employer had in August of 1974 begun a program of severe budget cuts.

3. Section 21(d) of the agreement provides in pertinent part:

The Union agrees to make every effort to provide pressmen, . . . on a straight-time basis to meet the marked-up operating assumptions of the Publisher. . . . This commitment includes a commitment to make every effort to provide straight-time replacements for 60% of the men who are on vacation or sick leave. This commitment includes a commitment to make every effort to provide straight-time replacements for non-occupational sickness and accident coverage provided for in Section 15 of this Agreement, jury duty, death in family, or scratches when such replacements are necessary to meet the manning requirements of this Contract.

4. The record indicates that a principal concern of the union was that if a pool of substitutes was created, *none* of the remaining situation holders would be able to substitute for other situation holders who had "scratched."

5. D.C.Code 1973, § 46–310(f) provides in pertinent part:

An individual shall not be eligible for benefits . . . if it has been found by the Board that such individual is unemployed . . . as a direct result of a labor dispute still in active progress in the establishment where he is or was last employed.

These were necessary because the economic prospects for the employer did not appear good for the year 1975. The employer had projected a reduction in advertising with a consequent reduction in revenue and in paper size for 1975. The company informed the union on December 13th and 14th that due to the economic condition that *there would not be sufficient presses working* to support the list of full time regular employees and therefore the claimants could no longer be employed as such. [Emphasis supplied.] The Board thus concluded that the claimants were without work because of the Post's layoff and hence entitled to unemployment compensation.

▉ The Post has petitioned this court to reverse the Board's decision pursuant to D.C.Code 1973, § 1–1510(3)(E), which provides that this court may "set aside any action or findings and conclusions [by an agency of the District of Columbia] found to be . . . unsupported by substantial evidence in the record of the proceedings before the court."[6] The Post contends that there is no evidence that the reduction of the markup was a layoff for economic reasons, but on the contrary, the evidence clearly establishes that the reduction was an effort to reduce the payment of overtime to the substitutes for situation holders who had scratched (Record at 229–30). The Post characterizes their action as a "reclassification" of the employment status of the 36 employees from situation holders to substitutes for situation holders, entitled only to straight time wages. In failing to consider the uncontroverted evidence that work shifts were available for the 36 claimants who refused to continue to work, the Post argues that the Board's decision is

contrary to the substantial evidence in the record.[7]

▉ Our review in this case is limited to the narrow question of whether the Board's findings are supported by substantial evidence on the record considered as a whole. D.C.Code 1973, § 1–1510(3)(E); *Charlton v. F.T.C.*, 177 U.S.App.D.C. 418, 422, 543 F.2d 903, 907 (1976); *Wallace v. District Unemployment Comp. Board*, D.C. App., 294 A.2d 177, 178 (1972). *See generally*, 1 K. Davis Administrative Law § 10.04 (1958). In *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Supreme Court reaffirmed an earlier definition of substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [*Consolidated Edison v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).] *See Wallace v. District Unemployment Compensation Board, supra* at 179. A reviewing court is bound by a decision of an agency that follows from its findings, if the findings are supported by substantial evidence, although the court may have reached a contrary result based on an independent review of the record. *Stewart v. District of Columbia Board of Zoning Adjustment*, D.C.App., 305 A.2d 516, 518 (1973).

Counsel for respondent asserts that the Board's decision was based on substantial evidence that the action by the Post was a layoff rather than a labor dispute. Two factual predicates are cited by the Board in reaching such conclusion: (1) the Post informed the Union on December 13th and 14th that "due to the economic condition there would not be sufficient presses work-

---

**6.** The District of Columbia Unemployment Compensation Board is an agency within the meaning of D.C.Code 1973, § 1–1510. The Board is required to follow the procedures of the Administrative Procedure Act, D.C.Code 1973, § 1–1501 *et seq.*; *Riley v. District of Columbia Unemployment Compensation Board*, D.C.App., 278 A.2d 691 (1971).

**7.** The Post argues alternatively that pursuant to D.C.Code 1973, § 46–310(c) the claimants should be denied compensation because they

have refused suitable work. The record reflects that for a period of time after the claimants refused to work as substitutes for other situation holders, the Post offered work to these claimants. The Appeals Examiner did not rule on whether the claimants were disqualified under Section 46–310(c) and the Board did not refer to this evidence in ruling that the pressmen were entitled to compensation.

ing to support the list of full time regular employees"; and (2) that the General Manager of the Post made a public announcement "that the reduction in the number of regular full time employees was in anticipation of a reduction in the size of the paper." (Respondent's Brief at 3.)

■ The record, however, does not support either of these findings of fact. During the meetings between the Union and the Post on December 13th and 14th, the Post told the Union that the reduction in the markup was directly attributable to the Union's practice of sticking, *viz.*, providing situation holders, at overtime pay, as substitutes for other situation holders who had scratched (Record at 30). The evidence reflects that the Post informed the Union that it could not afford to pay overtime rates to these substitutes and the practice of sticking was unfair abuse of the employment contract.[8] Moreover, the Post's management informed the Union that with proper scheduling it would be possible for each pressman who was deleted from the markup to work five full shifts a week, with *no* overtime (Record at 69).

While the Union's President testified at length that he was told that the action by the Post was the result of the economic condition of the paper, the Board's conclusion that the pressmen were actually laid off as a result of generally spiraling costs and reduction in the lineage of advertising does not necessarily follow. The Post's decision to reduce overhead was established on the record as an effort to cut back *excessive* payment of overtime in the pressroom by curtailing the Union's practice of "sticking". The Post's reduction of the markup was wholly consistent with its desire to cut back unnecessary costs generally but not to reduce manpower.

The public announcement, in the form of an article written by a reporter for the paper on December 15th, supports this conclusion. The article contains a statement that was relied on by the Board indicating the reduction of the markup was the direct result of the declining economic position of the paper. However, the General Manager of the Post is quoted as saying "[i]f all the pressmen worked only five shifts a week, *with no overtime*, there would be sufficient work to keep them all employed." (Emphasis added).

■ The Board's conclusion that the claimants were laid off for economic reasons is lacking in evidentiary support. The claimants' refusal to work without overtime stemmed directly from the labor dispute which involved the legality of the Post's attempt under the contractual agreement to force its pressmen to work without overtime. The Union President candidly admitted, according to the article in the Post, that he was not prepared to allow the paper to force the Union to give up part of their benefits under the contract, *viz.*, overtime pay and choice of hours of work. Whether the Post's reduction of the markup to reduce or eliminate payment of overtime was legal under the contract with the Union is, of course, not an issue before this court. The fact remains that the employer and employees were involved in a labor dispute[9] over the terms of the employment contract which resulted in the claimants' refusal to work. We therefore conclude that the claimants are disqualified from receiving unemployment compensation under D.C. Code 1973, § 46–310(f). The decision of the Board is hereby

*Reversed.*

---

8. The Post objected to the Union's practice of *uniformly* substituting situation holders for other situation holders who had "scratched". The Post asserted that the Union was not following the employment agreement which specified that the Union provide straight time substitutes for 60% of the situation holders that "scratched." *See* note 3, *supra*.

9. For the purposes of this appeal we accept the Appeals Examiner's definition of a labor dispute. *Supra*, note 1. *Cf. National Labor Relations Act*, § 2(9), 29 U.S.C. § 152(9).