**James E. ADAMS et al., Petitioners,**

v.

**DISTRICT UNEMPLOYMENT COMPENSATION BOARD, Respondent,**

**Washington Post Company, Intervenor.**

No. 12927.

District of Columbia Court of Appeals.

Argued Jan. 17, 1979.

Decided April 24, 1980.

---

* Denotes merits division.

   Separate statement of Associate Judge Nebeker as to why he would deny the petition for rehearing en banc is attached.

Mona Lyons, Washington, D.C., for petitioners.

D. Kevin Dugan, Washington, D.C., for respondent. Russell L. Carter, Washington, D.C., also entered an appearance for respondent.

Stephen R. Lohman, Washington, D.C., with whom Kenneth F. Hickey, Washington, D.C., was on the brief, for intervenor.

Before KELLY and NEBEKER, Associate Judges, and YEAGLEY, Associate Judge, Retired.*

KELLY, Associate Judge:

This appeal is from an order of the District of Columbia Unemployment Compensation Board [the Board] finding claimant petitioners ineligible for unemployment compensation benefits. Relying upon D.C. Code 1973, § 46–310(f),[1] the appeals exam-

---

* Judge Yeagley was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on April 20, 1979.

1. D.C.Code 1973, § 46–310(f) provides:

An individual shall not be eligible for benefits with respect to any week if it has been found by the Board that such individual is unemployed in such week as a direct result of a labor dispute still in active progress in the establishment where he is or was last employed: Provided, That this subsection shall not apply if it is shown to the satisfaction of the Board that—

(1) he is not participating in or directly interested in the labor dispute which caused his unemployment; and

iner concluded: (1) that the petitioners' unemployment was a direct result of a labor dispute between intervenor the Washington Post Company and the petitioners' own union, (2) that, by refusing to report to work, the petitioners were participating in a labor dispute between the Post and an affiliated union [the Pressmen], and (3) that the petitioners were members of the same "grade or class" as workers who participated in the Pressmen's dispute because some members of petitioners' union accepted strike benefit payments. He concluded that any one of these findings would lead to ineligibility under D.C.Code 1973, § 46–310(f). The Board adopted the appeals examiner's decision.[2]

Petitioners contend that there is insufficient evidence to support any of these conclusions. More specifically, they argue: (1) that absent evidence of a voluntary work stoppage, their union's negotiations with the Post did not rise to the level of a "labor dispute," (2) that given the Post's failure to comply with its announced intention of notifying the Paperhandlers of when to return to work, there is no evidence that they refused to report to work, and (3) that the evidence that Paperhandlers received strike benefits is ambiguous, attenuated, and negligible.

## I

Claimants are all members of the Washington Printing Specialties & Paper Products Union, Local 449, commonly referred to as the Paperhandlers. They all worked in the production and printing departments of the Washington Post. Their contract was set to expire at the close of September 30, 1975, but the contract included a clause that automatically extended it for a one-year period, absent formal termination by

either side. Neither the Post nor the union terminated the contract and negotiations on renewal of the contract began.

Meanwhile the Post was negotiating simultaneously, but separately, with Pressmen's Local 6, a union affiliated with the Paperhandlers. The Pressmen's contract also expired at the close of September 30, 1975. Shortly after midnight on that night, the Pressmen damaged the printing machinery, went out on strike, and established a picket line outside the Post building.

When the Paperhandlers arrived at the Post on the morning of October 1, 1975, they saw the picket line, police and firemen, and general confusion. They were told by Post staff, by police, and by Robert Anistead (President of the Paperhandlers' local), to go home and wait for the confusion to die down. At about this time, the Post posted on its door a notice that read in its entirety:

Due to extensive damage caused to our presses by striking Pressmen, the Washington Post is unable, temporarily, to continue publication.

Therefore, due to the action of the Pressmen, work is unavailable for employees in the Composing Room, Stereotype Department, Pressroom, Photo-Engraving, Mailroom, and Paperhandling Departments. This is not a termination of employment for the above mentioned employees, but only notice that there is no work for them to perform during this period.

When the Post is able to resume publication, employees in the above named departments will be notified when to return to work.

Employees in the Newsroom and Editorial Departments, Machine Shop, Operat-

---

(2) he does not belong to a grade or class of workers of which, immediately before the commencement of the dispute, there were members employed at the premises at which the dispute occurs, any of whom are participating in or directly interested in the dispute: *Provided*, That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate depart-

ments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises.

2. The Board did modify the appeals examiner's decision in regard to five claimants not involved in this appeal. That modification is irrelevant to the present appeal.

ing Engineers, Electric Shop, Advertising and related Departments, Promotion, Business Office, Building Service, and Inside Circulation Department, will be admitted to the building to perform work.

For those employees seeking current information on the situation the following numbers—7201 and 7202—can be called 24 hours a day.

We and the entire community deplore this irresponsible action by the striking pressmen, adversely affecting, as it does, so many of our loyal and conscientious employees.

On October 4, this notice was replaced by another one stating that there was a limited amount of work available in several departments, and specifically including the paper-handling department. Employees were advised to check with their chapel chairmen as to the availability of work and were given two telephone numbers to call for job information. On October 6, a third notice was posted indicating that there was work available in the claimants' department. Although telephone numbers were again given, the claimants made no attempt to contact the Post for information.

The Post resumed at least partial publication by October 21, 1975. The resumption was widely reported by the media and the papers appeared on the streets. However, none of the claimants reported to work.

During October, November, and December of 1975, petitioners' union and the Post met on numerous occasions to negotiate a new contract. An agreement was reached on December 18, and ratified by the union on December 21. After ratification, the workers returned to their jobs.

## II

■ Our review of the Board's decision is limited to questions of law and to a determination of whether the findings of the compensation authorities are supported by "competent evidence." [3] *Washington Post Co. v. District Unemployment Compensation Board*, D.C.App., 379 A.2d 694, 696 (1977). Moreover, D.C.Code 1973, § 46–311(f) specifically provides that the Board's findings "shall, if supported by evidence, be binding on the court." If the findings are supported, we may not reverse the Board, even though we "may have reached a contrary result based on an independent review of the record." *Washington Post Co. v. District Unemployment Compensation Board*, D.C.App., 377 A.2d 436, 439 (1977).

■ The Board, adopting the findings of the appeals examiner, found that the petitioners were ineligible for compensation benefits because were unemployed as a result of a labor dispute [4] between their union and the Post. It concluded that, despite the petitioners' allegations that they were unemployed because there was no work available at the Post, petitioners' union was engaged in a work stoppage conditioned upon the ratification of a new contract. The following facts from the record support the Board's conclusion: the Paperhandlers last worked on the final date of their old contract; the collective bargaining agreement was in effect by virtue of the automatic extension clause during the entire period of unemployment; there were at least fourteen bargaining sessions during October, November, and December; the union made no offer [5] or demand during the

3. Competent evidence is defined by D.C.Code 1978 Supp., § 1–1509(e) as "reliable, probative, and substantial."

4. The term "labor dispute" is not defined in the Unemployment Compensation Act. The Board looked to the definition of labor dispute found in the National Labor Relations Act, 29 U.S.C. § 152(9) (1970):

   The term "labor dispute" includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negoti-

ating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

We defer to the Board's decision to accept that definition in this case.

5. The president of the Paperhandlers' local testified that sometime in November or December, he offered to set up work rosters for the Post. The Post's chief negotiator, however, testified that neither the president nor anyone else of-

period that the Post provide work for the Paperhandlers; the notices posted on October 4 and 6 clearly announced that there was work available and provided telephone numbers for interested employees, yet neither the claimants nor the union inquired; the Post's return to normal operations indicated that there was work available, particularly since the skilled work of the Paperhandlers is essential to production of the newspaper; the union's decision to return to work was admittedly implicit in the contract ratification vote; and the union members returned to work only after a new contract was ratified. The Board's conclusion is a logical inference from the findings, and, since they are supported by the record, the decision will not be disturbed on appeal. D.C.Code 1973, § 46–311(f).

■ Alternatively, the Board found that the petitioners' union was "participating in or directly interested in the labor dispute" between the Post and the Pressmen, and consequently, petitioners could not qualify for benefits under the proviso to § 46–310(f). Although petitioners argued that they were not honoring the Pressmen's strike, but rather waiting to be "invited" back to work, the Board construed their actions as a voluntary refusal to cross a picket line.[6]

That there was a labor dispute between the Post and the Pressmen is uncontested. The Pressmen and the Paperhandlers were affiliated with the same international union, and the Paperhandlers' contract gave the members the absolute right to honor the Pressmen's picket line. The Pressmen's line was up throughout the entire period of petitioners' unemployment and, although there was work available, no Paperhandlers crossed it from October 6 to December 23. The fact that some Paperhandlers crossed the line after December 23 does not negate the inference drawn from the previous failure to cross; a supplemental agreement to the new contract, effective after December 23, required them to cross or lose certain job guarantees provided by the Post. The examiner, who was in the best position to judge the credibility of the witnesses, found that the petitioners voluntarily refused to cross the line and therefore could not receive benefits. *See Washington Post Co. v. District Unemployment Compensation Board*, 379 A.2d at 697. Since the conclusion flows from the findings, which are supported by the record, it must be upheld.[7]

The order of the Board on appeal is

*Affirmed.*

---

fered to have the members return to work without a signed contract. The appeals examiner credited the negotiator's testimony.

**6.** Many of the petitioners admitted on their applications for compensation that they were honoring the Pressmen's picket line.

**7.** Because of our disposition of the first two points, either of which the Board concluded would result in disqualification, we need not reach the third.