947 A.2d 443 (2008)
In re D.B., M.W., Appellant.
No. 03-FS-196.
District of Columbia Court of Appeals.
Argued December 18, 2006.
Decided May 1, 2008.
*445 Laurie McManus, for appellant.
Stacy L. Anderson, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time, and Edward E. Schwab, Deputy Attorney General at the time, were on the brief, for appellee, the District of Columbia.
Before FISHER and THOMPSON, Associate Judges, and BELSON, Senior Judge.
FISHER, Associate Judge:
This is an appeal from a judgment of the Superior Court prohibiting M.W. from visiting his daughter D.B. We affirm.[1]

I. Factual Background
D.B. was born on October 26, 1996, and lived with her mother and four sisters until she was committed to the District of Columbia Child and Family Services Agency after her mother entered into a stipulation of neglect on August 9, 2001. Appellant, her father, had visited D.B. and her older sister C.B.[2] from time to time when they *446 lived with their mother, and he saw them at weekly visits after they were placed in foster care.
On October 3, 2001, the Superior Court prohibited appellant from visiting D.B. and C.B. pending a criminal investigation into allegations of sexual abuse. Appellant repeatedly sought to reinstate his visitation rights, and in an order filed on November 25, 2002, the court scheduled an evidentiary hearing. That order explicitly notified the parties that hearsay would be admissible. The four-day hearing was held on December 12 and 20, 2002, and January 17 and 31, 2003, but appellant attended only the first day. On January 31, 2003, the court found clear and convincing evidence that appellant had sexually abused C.B. and D.B. Therefore, it continued to prohibit appellant from visiting his daughter D.B.
The court admitted a variety of evidence at the hearing. The girls' foster mother testified that both children told her that appellant touched them inappropriately, and C.B. also said that appellant engaged in various sexual acts with each of them. The foster mother said that D.B. was afraid of appellant. She also testified that both girls exhibited highly eroticized behavior, which she described in detail.
A doctor who examined the girls explained that highly eroticized behavior, like that described by the foster mother, can be a child's response to sexual abuse. The doctor also testified that C.B. had an abnormally "notched" hymen, a condition consistent only with sexual penetration. C.B. tested positive for chlamydia, a sexually transmitted disease.
Other evidence included interviews of D.B. and C.B. taped at the Children's Advocacy Center.[3] Appellant's counsel introduced the tape of the first set of interviews (of D.B. and C.B.) without objection from the government. The government introduced a second interview of C.B. without objection from appellant's counsel. Although appellant did not testify, he called a character witness to speak on his behalf. The government also introduced documentation that appellant had been convicted of sodomy in 1986.

II. Legal Analysis
An order denying a parent the right to visit his child may be appealed to this court, In re D.M., 771 A.2d 360, 364-66 (D.C.2001), and we review for abuse of discretion. In re Ko. W., 774 A.2d 296, 303 (D.C.2001). Judicial discretion must be founded on correct legal principles and a firm factual foundation. Id. However, "[t]he concept of `exercise of discretion' is a review-restraining one." (James) Johnson v. United States, 398 A.2d 354, 362 (D.C.1979). "The appellate court role in reviewing the exercise of discretion is supervisory in nature and deferential in attitude." Id. (internal quotation marks and citations omitted).
Appellant asserts that the trial court committed reversible error by admitting hearsay and violated his due process rights by relying on such evidence to make such an important decision. He contends as well that the court erred in considering his previous sodomy conviction. Finally, appellant argues that the record is insufficient to permit meaningful appellate review because the taped interviews of C.B. and D.B. are missing.

A. Hearsay Was Admissible
Appellant contends that the trial court erred when it allowed the foster mother to give hearsay testimony about her conversations with D.B. and C.B. and *447 when it admitted the second taped interview of C.B. Despite the government's arguments to the contrary, we consider this issue to be preserved for appeal.[4] If error occurred, we review under a harmless error standard. See, e.g., In re Ty. B., 878 A.2d 1255, 1266-67 (D.C.2005). Having reviewed our statutes, rules, and controlling precedent, we conclude that the court did not err by admitting hearsay.
Appellant argues that D.C.Code § 16-2316(b) (2001), which provides that "[e]vidence which is competent, material, and relevant shall be admissible at factfinding hearings," prohibited the use of hearsay at an inquiry of this kind.[5] This statute does not govern the issue before us, however. To be sure, one purpose of the hearing was to determine the relevant facts, but the proceeding did not fit within the corresponding definition of a "factfinding hearing"  that is, it was not "a hearing to determine whether the allegations of [the neglect] petition are true." Id., § 16-2301(16) (defining "factfinding hearing"). D.B.'s mother had already stipulated that D.B. was a neglected child.[6]
This was a hearing to determine the visitation rights of a non-custodial parent of a neglected child. The District of Columbia's statutes and rules of court do not specify how to conduct this type of inquiry.[7] However, "[t]he proper disposition of a neglected child, including the question whether a non-custodial parent should be granted visitation rights, is committed to the sound discretion of the trial court[.]" In re Ko. W., 774 A.2d at 303. See also D.C.Code § 16-2320(a) (stating that once a child is found to be neglected, the Family Court has jurisdiction "over any natural person who is a parent . . . of the child," and the court may order any lawful disposition of the child to protect the child's best interest).
As the statutes and rules in effect at the time of this hearing make clear,[8] the court addresses the issue of visitation in many different proceedings throughout the neglect process, including dispositional hearings, disposition review hearings, and permanency and permanency review hearings. *448 See, e.g., D.C.Code § 16-2320(f) (2001) ("In its dispositional order for a child adjudicated neglected . . .," the court shall address matters set forth in § 16-2319(c), which include visitation); Super. Ct. Neg. R. 21(b)(1)(C) (2002) (findings and order of disposition must address visitation, and "if visitation is prohibited or severely restricted," the order must include "reasons for the prohibition or restriction"); Super. Ct. Neg. R. 21(a) (2002) (at disposition hearings, court shall consider predisposition report, which is to include "a specific plan of visitation," see Super. Ct. Neg. R. 20(a) (2002)). Hearsay is admissible in such hearings. See D.C.Code § 16-2316(b) (2001) ("Evidence which is material and relevant shall be admissible at . . . dispositional hearings."); D.C.Code § 16-2323(d) (2001) (requiring agency, in preparation for a disposition review hearing or permanency hearing, to submit to the court a report that addresses, among other things, "[t]he extent to which visitation has occurred[,]" and that contains information that the agency presumably will derive from third party statements). Appellant has not identified, and we have not found, any statute or rule that prohibited the admission of hearsay in the proceedings under review.
Neither does our decision in Ko. W. support appellant's argument. In that neglect proceeding, there had been accusations of sexual abuse, and "the father [was] denied all visitation with his sons without ever having been given the opportunity to rebut the serious hearsay allegations against him."[9] 774 A.2d at 305. Indeed, "the father was never given the opportunity to testify. . . ." Id. at 306. Recognizing that denial of visitation seriously interferes with a non-custodial parent's right to raise his child, we held that the court must conduct an evidentiary hearing to ensure that its decision to deny visitation rests on a firm factual foundation. Id. at 305-06. We reversed and remanded, not because the court admitted hearsay evidence of the sons' accusations, but rather because it "prohibit[ed] visitation without conducting a factual inquiry, and without making a finding, as to whether the accusations against the father were true or false." Id. at 306.
Our opinion in Ko. W. apparently contemplates that hearsay evidence will be admitted,[10] but it stresses that there must be adequate safeguards to ensure that the parent has the opportunity to rebut it. Judge Keary ordered the hearing in this case to afford appellant those very safeguards. Indeed, her order scheduling the hearing cites Ko. W., and nothing in that decision suggests that error was committed here.

B. Due Process
Appellant contends that even if hearsay is admissible at some proceedings addressing the issue of visitation, reliance on it in this case offended due process because the court effectively terminated his parental rights by completely prohibiting him from visiting his child. Stated abstractly, this is by no means a frivolous claim. A parent has a fundamental liberty interest in the care and custody of his child, Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and prohibiting visitation certainly disrupts and, if the ban is prolonged, may destroy, the parent-child relationship. The importance of the interest involved is *449 "a commanding factor in the determination of what process is due. . . ." In re Jam. J., 825 A.2d 902, 915 (D.C.2003) (internal quotation marks and citations omitted). "On the other hand, the paramount consideration in neglect proceedings is the best interest of the child." Id.
"The amount of process due depends on the particular circumstances of each case because procedural due process is a flexible right." In re Pamela A.G., 139 N.M. 459, 134 P.3d 746, 750 (2006) (citation omitted); see Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Several courts in our sister jurisdictions have confronted a due process claim in related circumstances. See, e.g., In re A.S.W., 834 P.2d 801, 806 & n. 10 (Alaska 1992) (distinguishing between the adjudicatory and dispositional phases of "Children in Need of Aid" proceedings); In re J.D.C., 284 Kan. 155, 159 P.3d 974, 982-84 (2007) (child in need of care proceeding; discussing due process claim that judge should have forced the government to call the child on direct examination, but concluding that mother "waived her opportunity . . . to confront her daughter in court and challenge her accusations face-to-face" when she declined judge's offer "to summon J.D.C. to the courtroom for whatever cross-examination her mother's counsel saw fit to pursue"); In re Charles Jason R., Jr., 572 A.2d 1080, 1081 (Me. 1990) (finding of sexual abuse by father; rejecting parents' claim "that their due process rights were violated by the court's reliance solely on the out-of-court statements made by their son when he was less than four years of age"); In re Archer, 277 Mich.App. 71, 744 N.W.2d 1, 7-8 (2007) (termination of parental rights; "hearsay statements of children pertaining to acts of child abuse are admissible at the trial if the criteria for reliability set out in [a specified court rule] are satisfied"); In re Pamela A.G., 134 P.3d at 748 (discussing "those procedural safeguards that are necessary to afford a minimum level of due process in [a] neglect and abuse proceeding when the child does not testify"); In re M.B., 162 Vt. 229, 647 A.2d 1001, 1002 (1994) ("Hearsay evidence is admissible in a disposition hearing, . . . but where a timely objection is made, hearsay evidence alone may not be used as a basis for a finding of parental unfitness.") (emphasis in original; internal quotation marks and citation omitted). The analysis in these cases varies somewhat depending on local statutes and rules of evidence, but the courts generally look for assurances that the hearsay allegations are trustworthy and reliable. They also tend to distinguish between dispositional hearings and adjudicatory proceedings. Here, where the court was adjudicating whether appellant had sexually abused C.B. and D.B., it is arguable that due process would ordinarily require a more searching inquiry into the reliability of the hearsay evidence.[11]
We need not confront those issues directly, however, because our review is very limited. Appellant's hearsay objection was insufficient to preserve his due process argument for appeal. Cf. Long v. United States, 940 A.2d 87, 91 (D.C.2007) (hearsay objection did not preserve claim that confrontation clause was violated; plain error standard applied); Marquez v. United States, 903 A.2d 815, 817 (D.C. 2006) (same); see also Williamson v. United States, 445 A.2d 975, 980 n. 5 (D.C.1982) *450 ("It is settled . . . that a party objecting to evidence must make known to the court and opposing party . . . the precise ground on which the party is basing his objection."). Because appellant never raised a due process objection below, or sought to call the children as witnesses, we review only for plain error. In re J.W., 837 A.2d 40, 47-48 (D.C.2003) (due process challenge to neglect proceeding was not preserved for appeal because it was not raised in the trial court).
Under the test for plain error, appellant first must show (1) "error," (2) that is "plain," and (3) that affected appellant's "substantial rights." Even if all three of these conditions are met, this court will not reverse unless (4) "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Thomas v. United States, 914 A.2d 1, 8 (D.C.2006) (internal quotation marks and citations omitted); see United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In the absence of a statute, a rule, or governing case law, we doubt that appellant could demonstrate "error" that was "plain" and that affected substantial rights. But even if we assume, for the sake of argument, that appellant could establish these first three prongs of the plain error standard, his argument fails on the fourth requirement because he cannot show that the admission of hearsay seriously affected the fairness, integrity, or public reputation of these judicial proceedings.
Appellant was given ample opportunity to test the reliability of the hearsay presented. In accordance with Judge Keary's pre-hearing order, the government notified appellant's counsel that it planned to call the foster mother and the doctor and intended to introduce the tape of C.B.'s second interview. Its brief summary made clear that much of the evidence would be hearsay.[12] Although he was present during the foster mother's testimony on the first day and therefore was fully aware of the allegations against him, appellant made no attempts to controvert the hearsay evidence. He did not testify and did not even attend the last three days of the four-day hearing. Neither did he ask the court for an opportunity to examine D.B. or C.B. in order to test the reliability of their allegations.[13] When evidence is "essentially uncontroverted . . ., appellant cannot claim that fairness requires that he nonetheless be given a chance to contest it now." Thomas, 914 A.2d at 23 (internal quotation marks omitted).
Moreover, the government's case did not rest upon hearsay alone. Both C.B. and D.B. had engaged in eroticized behavior, which was circumstantial evidence corroborating their statements that they had *451 been sexually abused. The doctor's examination confirmed that C.B. had been abused  she had an abnormally "notched" hymen and had been infected with a sexually transmitted disease. Appellant correctly points out that the physical examination did not establish that D.B. had been abused, but if appellant had abused her half-sister, who was barely a year older than D.B., and who appellant thought at the time was his own child, the court would be completely justified, on that ground alone, in precluding visitation with D.B.
Appellant certainly had ample opportunity to abuse both girls and, contrary to his suggestion, the record supports the trial court's conclusion that the girls were referring to him when they indicated that "Moe" or "daddy" had abused them. Moreover, the court properly drew an adverse "inference from [appellant's] failure to challenge these specific allegations."[14]See In re Antj. P., 812 A.2d 965, 971 (D.C.2002) (termination of parental rights; "Since [father] sat mute at the TPR hearing, we cannot say that the trial court improperly drew an adverse inference as to his relationship with his son, where the controlling legal principle is `the best interests of the child.'"); In re L.H., 634 A.2d 1230, 1234 (D.C.1993) (termination of parental rights; "In that limited sense [described in the opinion, mother's] refusal to testify in the proceedings may have worked against her, but legitimately so."); see also In re Samantha C., 268 Conn. 614, 847 A.2d 883, 899 (2004) (termination of parental rights; "a trier of fact generally may draw an adverse inference against a party for its failure to rebut evidence"); Custody of Two Minors, 396 Mass. 610, 487 N.E.2d 1358, 1363 (1986) ("the adverse inference drawn from the failure of a party to testify is not sufficient, by itself, to meet an opponent's burden of proof"); Commissioner of Social Services v. Philip De G., 59 N.Y.2d 137, 463 N.Y.S.2d 761, 450 N.E.2d 681, 683 (1983) (paternity and child support; "The failure of respondent to testify . . . allow[s] the trier of fact to draw the strongest inference against him that the opposing evidence in the record permits. . . .") (internal citation omitted); West Virginia Dep't of Health and Human Resources v. Doris S., 197 W.Va. 489, 475 S.E.2d 865, 874 (1996) ("[W]here the parent . . . fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a [trial] court may properly consider that individual's silence as affirmative evidence of that individual's culpability.").[15]
Relying on Jam. J., a decision issued after the hearing in this case was *452 completed, appellant nevertheless contends that due process requires that a parent be able to cross-examine his child accuser before the right of visitation may be denied. This argument overstates our holding in that case. There, hearsay statements of the children had been introduced as the primary evidence of abuse and neglect and we held that the trial court abused its discretion when it flatly refused to call the children at the mother's request. 825 A.2d at 919. We did not establish an absolute rule, however, but held that the court should have conducted a sensitive inquiry balancing the rights of the parent against the possibility of harm to the children. Id. at 917-19.
Although its analytical framework is instructive, the holding in Jam. J. does not govern this case. That decision did not discuss the issue of visitation. Moreover, the court did not suggest, and certainly did not hold, that the government is obliged to call the children to the stand.[16] Most importantly, we framed the issue as "whether or under what circumstances a trial court may deny a parent's request to call and examine his or her child as a witness in a neglect proceeding or other civil proceeding concerned with the child's welfare." 825 A.2d at 911 (emphasis added); see also id. at 916 (referring to "the parent's right to call and confront the child in court"); id. at 917 n. 10 (making clear that court was not addressing "the availability and scope of cross-examination when the government or the guardian ad litem has presented the child as a witness in the fact finding hearing"). Here, of course, appellant never attempted to call D.B. or C.B. as witnesses, and thus he has not preserved a due process issue for appeal. See In re S.A., 708 N.W.2d at 679 (termination of parental rights; "it is unnecessary to undergo a due process analysis because these parents were not denied the opportunity to cross-examine the children. Instead, the lack of cross examination was due to their decision not to [subpoena and] question the children.") (emphasis in original); cf. In re J.L., 884 A.2d 1072, 1080 (D.C.2005) (trial court waived mother's consent to adoption of children; it was reasonable to infer from guardian ad litem's support of the petition that children preferred to be adopted; "If the mother thought otherwise, she could have called the children as witnesses.").
Because our review is limited, we do not attempt to establish due process requirements that might apply in other circumstances. Appellant certainly has not established that plain error was committed in his case.

C. Use of Appellant's Prior Conviction
Appellant also argues that the trial court committed reversible error when it concluded from the judgment and commitment order, introduced as a government exhibit, that his 1986 sodomy conviction involved a victim who was a minor. The government led the court to believe that the statute underlying appellant's conviction applied exclusively to sodomy of a minor. That statute in fact prohibited sodomy of any person, whether an adult or a child, but it authorized enhanced punishment if the victim was under the age of sixteen. D.C.Code § 22-3502 (1981) (repealed).
Appellee used the prior conviction primarily to impeach the credibility of appellant's character witness, who claimed to *453 have been in close contact with appellant for the entire thirty years of their friendship. Without alluding to the age of the victim, counsel for the District of Columbia established that the character witness did not know that appellant had been convicted of sodomy and incarcerated for a period of years. D.B.'s guardian ad litem asked the witness if his opinion of appellant would change if he knew appellant had been convicted of oral sodomy of a teenager.[17] The witness acknowledged that his opinion "probably would" change.
Even if we assume that appellant's unclear objection preserved this issue for appeal, and that we review under the harmless error standard, we find no reversible error. The harmless error standard allows us to reverse only if, "after pondering all that happened[,]" we "cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error[.]" In re Ty. B., 878 A.2d at 1266 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The court's explanation of its ruling shows that the unsupported conclusion that appellant had been convicted of sodomy of a minor did not substantially sway its decision.
Judge Keary explained that the impeachment questions had "undermined" the character witness's testimony because "he knew nothing about the fact that [M.W.] had been convicted of a serious criminal act, conviction of sodomy, several years ago and had been imprisoned for a substantial period of time." As a result, the court did not consider the character testimony "significant in the Court's evaluation of whether or not in fact there was strong evidence of sexual abuse in this case." The court did not mention the victim's age at all when explaining its assessment of the witness's testimony. In any event, the error in interpreting the judgment and commitment order is of no consequence because appellee represents, and appellant seems to agree, that the victim in appellant's criminal case was in fact a seventeen-year-old boy  a teenager, as the guardian ad litem had represented in his question.
The court committed no error in allowing appellant's prior conviction to be used in this manner. See Devore v. United States, 530 A.2d 1173, 1174 (D.C.1987) (prosecutor may test character witness's knowledge of defendant's reputation in the community "by asking whether [he] has heard of particular events, including prior convictions, arrests, and wrongful acts of the defendant") (citing Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948)) (additional citations omitted). The fact that the character witness did not know of appellant's conviction and incarceration showed that he had lost contact with appellant for a significant period of time and was not a reliable judge of his character.
The government also urged the court to take into account the nature of the crime. Although the court did not consider the conviction to be "significantly weighty," it did treat it as "some additional evidence." We are skeptical that sodomy of a teenage boy would establish any unusual sexual preference pertinent to this case. See, e.g., Pounds v. United States, 529 A.2d 791, 794 (D.C.1987) (evidence of past sexual abuse is admissible only to prove predisposition to satisfy sexual desire with same victim again); Johnson v. United States, 610 A.2d 729, 730 (D.C.1992) (evidence of prior sexual misconduct with different person is admissible solely to show unusual *454 sexual preference for similar acts); cf. FED.R.EVID. 414 and 415 (admissibility of evidence of similar acts in civil or criminal cases involving child molestation). However, as the court pointed out, this was a civil matter, not a criminal case; the court concluded that "it would not . . . offend the simple ten[e]ts of relevance to permit it to be admitted."
We review decisions to admit evidence, including evidence of other crimes, for abuse of discretion. Sanders v. United States, 809 A.2d 584, 591 (D.C.2002); Garibay v. United States, 634 A.2d 946, 949 n. 9 (D.C.1993); see also (William) Johnson v. United States, 683 A.2d 1087, 1099 (D.C. 1996) (en banc) (evidence otherwise relevant, including other crimes evidence, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice). "We need not determine whether the court erred" by considering the prior conviction for a substantive purpose, because appellant "was not sufficiently prejudiced by [any] error to justify reversal. . . ." Sanders, 809 A.2d at 591; see (James) Johnson v. United States, 398 A.2d 354, 367 (D.C.1979) (a trial court has not abused its discretion unless "the exercise of discretion was in error and . . . the impact of that error requires reversal"). In reaching the conclusion that sufficient prejudice has not been established, we are mindful that this matter was tried without a jury, see Flores v. United States, 698 A.2d 474, 482 (D.C.1997) ("the risk of the evidence having an unduly prejudicial effect on the jury was not present"), and that the trial court did not consider the evidence to be "significantly weighty."

D. The Missing Tapes
Finally, appellant contends that the record is inadequate to permit meaningful appellate review because the video tapes of the interviews with D.B. and C.B. at the Children's Advocacy Center have been lost. The court reporter did not make verbatim transcripts of the tapes because the court watched them in chambers. The contents of those interviews are included in the record only through "transcripts" created pursuant to D.C.App. R. 10(d).
In circumstances like these, we must review the record "to determine whether it is adequate to permit appellant a meaningful opportunity to locate and challenge errors . . ., and to permit this court to exclude the possibility of any error other than harmless error." Cole v. United States, 478 A.2d 277, 285 (D.C. 1984) (internal quotation marks and citation omitted); see also Williams v. United States, 927 A.2d 1064 (D.C.2007). Based on our review, we conclude that this record is adequate, and we reject appellant's argument.
Through diligent effort, the parties reconstructed the taped interviews using a variety of sources, including the assistant attorney general's handwritten page of notes regarding the second interview of C.B.; the guardian ad litem's e-mail responding to questions from appellant's counsel about the interviews;[18] recollections of the tapes' contents recited in the transcript of the February 25, 2005, hearing conducted pursuant to Rule 10; and especially the twenty-one pages of notes Judge Keary took as she watched all three interviews. All these sources, along with the "transcripts" that were created, are part of the appellate record. Moreover, the complete transcript of the four-day hearing includes every observation and argument *455 made by any of the parties regarding the contents of the tapes.
Even with the assistance of these resources, appellant has not identified any specific error he wishes to raise for which the reconstructed record is inadequate. See Lucas v. United States, 476 A.2d 1140, 1142-43 (D.C.1984) (holding that mere possibility of error was too remote to justify reversal based on inadequacy of the record where the appellant failed to suggest any specific errors that would be shown in the missing portions of a transcript). Appellant simply contends that he may not be able to determine if an error occurred, and he suggests that Judge Keary's notes may be inaccurate. However, it is not likely that the trial court would overlook any portion of the interviews that implicated or exculpated appellant.
Furthermore, it would be almost impossible for appellant to establish reversible error in the admission of the initial interviews of D.B. and C.B. because he is the one who offered them into evidence. Indeed, he even argued that those interviews refuted the foster mother's testimony. Although C.B. implicated appellant in her second interview, appellant's counsel, who had watched that tape, did not object when the government moved for its admission. Having failed to object, he would have an uphill battle to establish that admitting that tape constituted reversible error. For all these reasons, we are confident that this record is adequate to permit meaningful appellate review.

III. Conclusion
Appellant has not shown that the trial court committed any errors that would justify reversal under the applicable standards of review. Accordingly, we affirm.
NOTES
[1] The District of Columbia has filed a motion to dismiss this appeal as moot because a petition to adopt D.B. was granted by the Superior Court. The adoption is not final, however, because it has been appealed to this court. Therefore, we decline to dismiss for mootness.
[2] Appellant initially believed he was the father of both girls, but a subsequent paternity test showed that C.B. is not his child.
[3] The interviews took place in late October of 2001. D.B. was interviewed four days before her fifth birthday. C.B. was slightly more than six years old.
[4] When it scheduled the hearing, the trial court notified the parties that hearsay would be admissible. Appellant's counsel nevertheless objected on hearsay grounds early in the foster mother's testimony. The court overruled his objection, confirming that hearsay was admissible: "That's the law. You are also on notice of it with the Order that I put in place structuring the hearing."
[5] In making this argument, appellant assumes that hearsay evidence must be excluded because it is not "competent." We have found no explanation of what this statute means by "competent" evidence, but we have said in the criminal law context that "hearsay is deemed competent when other indicia of reliability make up for the absence of live testimony." Johns v. United States, 434 A.2d 463, 473 (D.C.1981). In the administrative context, we have equated "competent" evidence with proof that is "`reliable, probative and substantial.'" Adams v. District Unemployment Compensation Board, 414 A.2d 830, 833 n. 3 (D.C.1980). A definition of competent evidence that governed criminal or administrative cases would not necessarily apply to other types of proceedings, however. We need not resolve this question because, as we demonstrate in the text, D.C.Code § 16-2316(b) does not apply to this proceeding.
[6] Appellant did not live with D.B., her sisters, and their mother, and the neglect petition made no allegations concerning him.
[7] However, we have held that "[n]othing in the statute requires that a finding of neglect must first have been entered against a non-custodial parent before the court may order a disposition over that parent's objection." In re S.G., 581 A.2d 771, 784 (D.C.1990).
[8] Many of the relevant statutes and rules have since been amended. Unless we indicate otherwise, we will refer to and quote from the rules in effect at the time of the hearing.
[9] The neglect petition in that case contained no allegation against the father. In re Ko. W., 774 A.2d at 298.
[10] For example, "we [did] not suggest that in-court testimony by K.W. [one of the sons] is the only possible way of ascertaining the facts. . . ." 774 A.2d at 306 n. 12.
[11] Appellant appropriately refrains from arguing that he was denied the Sixth Amendment right of confrontation, which applies only to criminal cases. See, e.g., In re J.D.C., 284 Kan. 155, 159 P.3d 974, 981 (2007) (Confrontation Clause did not apply to "child in need of care" proceeding); In re S.A., 708 N.W.2d 673, 679 (S.D.2005) (Sixth Amendment right of confrontation did not apply to civil abuse and neglect proceeding).
[12] The government revealed that the foster mother would testify about "[d]isclosures made to her by [C.B. and D.B.] in or around September, 2001, concerning various forms of sexual contact made by [M.W.] on both girls," and the doctor would testify about "[d]iagnosis and treatment of [C.B.] for chlamydia [and] the likely cause of [the] disease." The government also indicated that in the taped interview C.B. disclosed sexual contact by M.W.
[13] We have recognized that "[t]he potential importance to the parent of being able to elicit the child's live testimony is heightened where . . . the proof of neglect depends critically on the admission of accusatory statements that the child herself made outside of the courtroom." In re Jam. J., 825 A.2d 902, 915 (D.C.2003) (citing In re Ko. W., 774 A.2d at 306 n. 12 (referring to cross-examination as "the greatest legal engine ever invented for the discovery of truth.") (internal quotation marks and citations omitted)). Nevertheless, the fact remains that appellant never asked for the opportunity to cross-examine the children who had accused him of sexual abuse.
[14] The court noted that appellant "sat through all of that testimony [from the foster mother], . . . heard the testimony of Dr. Able and chose to absent himself from the next two now three hearings at which he could have responded and offered contradictory testimony."
[15] This adverse inference does not violate appellant's constitutional right against self-incrimination. See Mitchell v. United States, 526 U.S. 314, 328, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (stating "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them") (quoting Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)); West Virginia Dep't of Health and Human Resources, 475 S.E.2d at 874 (abuse and neglect proceeding; "silence in the face of accusation is a relevant fact not barred by the Due Process Clause.") (quoting Baxter, 425 U.S. at 319, 96 S.Ct. 1551); see also Custody of Two Minors, 487 N.E.2d at 1363-64 ("the privilege against self-incrimination applicable in criminal proceedings, which prevents the drawing of a negative inference from a defendant's failure to testify, is not applicable in a child custody case.").
[16] Instead, we noted that "[t]he potential importance to the parent of being able to elicit the child's live testimony is heightened where, as in the present case, the proof of neglect depends critically on the admission of accusatory statements that the child herself made outside of the courtroom." 825 A.2d at 915 (internal citations omitted).
[17] At a previous hearing, the guardian ad litem explained that he had seen the arrest records, which revealed that M.W.'s victim was a teenager at the time of the offense.
[18] The guardian ad litem accompanied both children to the interviews. He was not in the interview room with them, but he watched through a one-way mirror.